MILTON D. CRAIGMILE AND ANOTHER v. ADOLF O. W. SORENSON AND ANOTHER.[1]

May 29, 1953.

No. 36,017.

[1]Reported in 58 N. W. (2d) 865.

A. D. Bornemann and Harry H. Peterson, for appellants.
Lyman A. Brink and Philip E. Thorson, for respondents.

KNUTSON, JUSTICE.

Appeal from an order denying defendants' motion for amended findings of fact and conclusions of law or for a new trial.

This action arises out of an alleged sale of a quarter section of land by defendants to plaintiffs under a contract for deed. Viewing the evidence most favorable to the prevailing parties, as we must on appeal, the following facts could be found to be true.

All parties to the action have lived in substantially the same community in Kittson county during most of their lives. Defendant Adolf O. W. Sorenson was 36 years of age at the time of trial and had purchased and owns several tracts of land. Plaintiff Milton D. Craigmile was 25 years of age and had never owned land before. During the month of November 1950, Sorenson and Craigmile had some negotiations looking toward the sale of this quarter section of land by Sorenson to Craigmile, and a contract for deed was prepared and signed by these two parties. Their wives did not sign the contract, and for some reason the deal was never consummated. On April 14, 1951, the parties met at the creamery in the village of Hallock, and the matter was again brought up briefly. The next day, which was Sunday, Mr. and Mrs. Craigmile went to the farm home of the Sorensons and spent all afternoon and evening. The two men discussed the proposed sale. Sorenson had quite a large amount of hay in the barn, and the sale of the hay to Craigmile was also discussed. Sorenson had before him the old contract which

had been prepared the previous November, and he made a list of items he was to have a right to remove from the farm. At first, Sorenson offered to finance the whole deal, but Craigmile did not want that and stated that he would procure the down payment of $2,500 from his father-in-law, Erhard Blide. The purchase price of the farm was to be $16,000. It was agreed that Craigmile would pay an additional $1,500 for the hay, which amount would be added to the purchase price. The balance of the purchase price, aside from the down payment, was to be paid in semiannual installments of $500 each, with four percent interest on deferred balances.

The next morning the Craigmiles and Blide again went to the Sorenson farm and they again discussed the deal. After some discussion, Sorenson called several attorneys in Hallock for the purpose of having a contract prepared but they were unable to locate an attorney. Blide then left the farm, and plaintiffs and defendants drove to Hallock together. While there they saw Burt Sundberg, county attorney, who agreed to draw up the contract and they thereupon all went to Sundberg's office. He obtained the necessary information respecting the terms of the contract from Sorenson and thereafter prepared a contract for deed. All parties read it over. The contract had been drawn so as to require plaintiffs to pay the 1951 taxes. They objected to that provision and with the consent of defendants the contract was corrected in that respect, and all parties signed it. Subsequent to the signing, Sorenson discovered that they had forgotten to include the hay. Thereupon the figure $16,000 was erased and $17,500 was inserted by Sundberg as the purchase price. A copy of the contract was delivered to plaintiffs and also to defendants.

At the same time another instrument was prepared by Sundberg pursuant to instructions from Sorenson. On the top part of the page appeared a rough drawing of the fences which defendants were to have a right to remove from the property. Beneath the drawing Sundberg typed the following:

"The above (Red Lines) purports to describe the approximate location of the steel posts and fence located on the W½ of Northwest

quarter and North half of the Southwest quarter of section 28-161-48 which Adolph O. W. Sorenson and Ruby C. Sorenson, his wife reserve for removal on or before Nov. 1, 1953 and which land they are selling under contract for deed this date to Milton D. Craigmile and Mary Joan Craigmile, his wife.

"Witnesseth that the purchasers will agree to allow sellers to remove same:

"Milton D. Craigmile

"Mary Joan Craigmile"

After these instruments had been executed, Sorenson gave Sundberg his check for five dollars for drawing the contract. Then all parties left the office together and had lunch at a restaurant. On the farm involved there was a stove which required alcohol to start. Since plaintiffs did not know how to start the stove they purchased some alcohol after lunch and all parties went to the farm where Sorenson showed Craigmile how to start the stove. The Sorensons then picked up some of their things which were in the house. The next day plaintiffs began moving their household goods and furniture into the farm home making two or three trips during the day. Defendants were also there at the time picking up more of their belongings. Sorenson claims that he attempted to stop plaintiffs from moving in, but the court's finding to the contrary is well supported by the testimony of other witnesses.

On the following Thursday, Sorenson was again at the farm and asked Mrs. Craigmile if they had been able to raise the down payment. She told him that they had but that Mr. Craigmile was not at home at that time and that if Sorenson would wait until her husband came he could have the money. Sorenson stated that he could not wait on that occasion.

On Saturday, plaintiffs tendered to Sorenson a check in the amount of $2,500. Sorenson refused to accept it. They then procured the cash money and made a legal tender, which was likewise refused.

On May 22, 1951, Sorenson went upon the premises and seeded some 30 acres of barley. It is alleged that he also removed and at-

tempted to remove property which he had no right to remove. Thereupon this action was commenced to restrain defendants from trespassing upon the premises or interfering with plaintiffs' possession thereof. The court found that the parties had entered into a valid contract and enjoined defendants from interfering with plaintiffs' possession. Defendants' motion for amended findings of fact and conclusions of law or for a new trial was denied, and this appeal followed.

■ Defendants assign a number of errors, but the principal and decisive question presented here is whether payment of the initial $2,500 was a condition precedent to the formation of a binding contract between the parties.

Defendants contend that in their testimony that there was to be no contract until they received the down payment is uncontradicted and unimpeached and therefore compels, as a matter of law, a finding that such payment was a condition precedent. With this contention we cannot agree. The testimony of plaintiffs, of Blide, and of attorney Sundberg, together with the conduct of the parties, amply sustains a finding to the contrary.

Sorenson's testimony, relied upon to establish the fact that the making of the down payment was a condition precedent, is the following:

"Q. Now, when you were at your home on—either at your home on the morning of April 16th or in Mr. Sundberg's office did you state to Pete the terms and conditions on which you would enter into a contract?

"A. Yes.

"Q. Will you state what that was?

"A. Out at the farm that morning I had agreed to go into a contract with a $2,500 cash payment on contract.

"Q. What did you say about that?

"A. I told him I'd have to have a $2,500 cash payment on the contract to clear the quarter that I had borrowed money on so that Erhard could examine the abstract.

"Q. In other words, you wanted this $2,500 down payment to pay off the mortgage that was then on the land that you were about to sell?

"A. Yes.

"Q. Did you state to him why it was so necessary to have the $2,500 or what the effect of it would be?

"A. Well, I knew I'd have to have that $2,500 to be able to get the contract out of the bank so that Erhard could get hold of it.

\* \* \* \* \*

"Q. Did you tell him what effect it would have on the contract, what it had to do with the contract that you were going about to make?

\* \* \* \* \*

"A. I told him I wouldn't sell that farm down there without a $2,500 cash payment.

\* \* \* \* \*

"Q. That was a condition of the bargain, was it?

"A. Yes."

Mrs. Sorenson testified as follows:

"Q. Did Adolf say anything as to whether or not there would be a contract if the $2,500 wasn't paid down?

"A. No, there would be no contract unless the money was paid."

When Mr. Sorenson was called for cross-examination under the statute, his testimony was quite evasive. With respect to a down payment, he testified:

"Q. You stated on Sunday that if he [Craigmile] used your money you'd help him out?

"A. That's before he found out that Erhard would back him.

"Q. Didn't he tell you at that time he could get the money from Erhard that he could get it in a week?

"A. He told me he didn't need me to carry him, he was going to get Erhard to back him. I meant to sell it to him and finance the whole deal but he didn't want it.

"Q. You knew at that time he didn't have the $2500?

"A.   I never asked him.

"Q.   You knew if you were going to finance him that he didn't have it?

"A.   That was the deal between us.

"Q.   That you wanted to finance him for the whole deal, didn't you?

"A.   No.

* * * * *

"Q.   Now, on Sunday when he was out on your farm you talked about the financing of the farm, didn't you?

"A.   I just told him he'd have to give me $2500 down if he wanted to buy the farm.

"Q.   You told him you would finance him if he didn't have the money?

"A.   No.

"Q.   Isn't that what you just said, if he used your money and you financed it?

"A.   Providing he done the deal with me, he wanted to have his father-in-law, but Pete didn't want it that way, he wanted the land and he got it."

Mr. Craigmile testified as follows:

"Q.   Tell us what was said in regard to the down payment?

"A.   Adolf said he'd finance me and I told him no, he didn't have to, I'd get the money.

"Q.   Was there anything at that time, if you recall, said about when you would get that money?

"A.   Well, it wouldn't be right away, it would be within the next few days, within a week."

Mr. Blide testified:

"Q.   Was there anything said about the down payment or the terms?

"A.   Yes.

"Q.   What was that?

"A. Well, Adolf said he wanted the down payment—it was $2,500 and Pete said, 'Well, I'd have to get that from my father-in-law'. Adolf says, 'that's all right'. Then I told him, I says, 'It will take me', I says, 'about three or four days or so to secure this money because I've got to go out of town for it', to get it, and Adolf says, 'That's all right, you can pay it after the contract is drawn up'."

There is much other testimony which substantiates the court's finding that the parties intended the contract to be binding upon its execution. Mr. Craigmile testified as follows:

"Q. Can you tell us whether or not as you were leaving Mr. Sundberg's office you and Mr. Sorenson had any conversation?

"A. He said 'now that's settled'."

Mrs. Craigmile testified, with respect to the same conversation, as follows:

"Q. Now, was there any conversation between any of the four of you as you left the office with Mr. Sundberg?

"A. Adolf said, 'well, that's settled'."

Mr. Blide testified that after they left Sundberg's office they had lunch at Chip's Cafe and that at that time the following conversation took place:

"Q. Do you recall whether or not anything was said about this transaction at that time?

"A. Yes, Adolf says, 'Well, the deal is made'."

Coupled with the testimony of the witnesses are the following facts: A copy of the executed contract was delivered to plaintiffs; the collateral instrument which was drawn indicates that the parties intended the contract to be binding upon the execution thereof; the Sorensons took plaintiffs to the farm and showed them how to operate the stove; plaintiffs were permitted to move in and the Sorensons moved their personal belongings from the house; Sorenson removed much of the property reserved to him in the contract; and after Sorenson had refused the tendered down payment,

he went to Sundberg to ascertain whether the contract could be avoided. Sundberg testified as follows:

"Q. Mr. Sundberg, did any of the parties ever come back to you with reference to this contract?

"A. Mr. Sorenson and his wife came over to my house on the Sunday following this date, I don't know what date this fell on but I remember it was on Sunday because they came to my house Sunday afternoon if I remember right.

"Q. And you had a conversation with them then with reference to this contract?

"A. Yes, sir, they came over and wanted to know if there was some way that they could break this contract and I told them I didn't think there was any way; I thought it was a binding contract.

"Q. That is about all that was said on that occasion?

"A. That was the sense of what was said, that was the reason they were there apparently.

"Q. Did you have any subsequent conversation with them after that Sunday?

"A. Mr. Sorenson was up at my office on several occasions and he was asking me again whether there was some way, some loophole that he could get out of this contract and I assured him that I felt it was a binding contract and there was no way out.

"Q. Do you know of the existence of a lawsuit last fall between the parties to this action?

"A. Did I?

"Q. Yes.

"A. I heard there was one.

"Q. Did Mr. Sorenson talk to you at any time with reference to your being a witness in that lawsuit?

"A. Mr. Sorenson came up to see me last fall, as I say, he came up at various occasions, I never made any record but I do recall that he came up last fall in October I would say or in November sometime and asked me whether I didn't remember that they were supposed—that is the parties to this contract—were supposed to

come back to my office the next day or at any other time and change the terms of the contract and I told him that nothing like that was ever said and he told me that if I could remember that it would help his case, and I said, 'if I am ever called upon to testify I'll tell what happened and will not make up any story as to what would help anyone else', that's exactly what I told him, I think he'll remember that."

The court's finding that plaintiffs moved their household goods and furniture into the dwelling and took possession of the farm on April 17, 1951, with the knowledge and consent of defendants and that they have been in actual possession thereof since that time is amply sustained by the evidence.

Whether payment of the initial sum of $2,500 was a condition precedent to the formation of the contract was a question of fact. The court's finding to the contrary has substantial support not only in the testimony but from the conduct of the parties subsequent to the execution of the contract.

Defendants rely upon Pogreba v. O'Brien, 223 Minn. 430, 27 N. W. (2d) 145. The facts in that case are clearly distinguishable from those in the case now before us. In fact, they are almost the reverse. There, plaintiff was in possession of a hotel property under a lease. He and defendant, who owned the property, had been conducting negotiations for the purchase of the property for some time. Finally, on May 21, they signed a contract for deed under which plaintiff contracted to buy the property for $80,000, of which $15,000 was to be paid as the first payment. Defendant kept all copies of the contract. After the execution of the contract the parties continued negotiations to the end of the lease. When the lease expired the parties met on July 5 to settle their respective rights and obligations under the lease. An accounting was had, and defendant paid plaintiff the amount they found was due. Plaintiff thereupon surrendered possession of the premises. Sometime later, plaintiff brought the action for specific performance. In affirming the trial court, we said (223 Minn. 433, 27 N. W. [2d] 146) :

"* * * it is obvious that the initial payment was a condition precedent to the formation of the contract, and O'Brien emphatically so asserted. The instrument was made in duplicate. Both duplicates were retained by him awaiting tender or payment of the initial payment. As we have seen, no such payment was made or tendered. Instead, plaintiffs sought various modifications from time to time, including the substitution of a residence property owned by them, estimated to be worth between $6,000 and $7,000, to be applied upon the initial payment. This proposition, however, never went beyond the stage of negotiation. Likewise, plaintiffs sought a reduction of the interest rate and the privilege of on-or-before payments. None of these became operative. They, also, were negotiations only and remained so. The suit has for its basis a mere expression of plaintiffs' belated change of mind, coupled with an attempt to rely upon the written instrument as a means of getting the property in question without paying or tendering the initial $15,000. O'Brien testified, 'I never figured it [the written instrument] was binding until the payment was made; that was part of the contract.' And that, too, was Pogreba's idea. He testified as follows:

"'Q. You knew it [the instrument] required you to make a down payment as a prerequisite to closing the contract?

"'A. That's right.'"

█ Defendants next contend that evidence of the oral negotiations prior to the execution of the written contract are inadmissible to establish the fact that receipt of the down payment was not a condition precedent to the formation of the contract. This contention is apparently predicated upon the rule that the provisions of a written contract merge all prior negotiations and agreements and that the written contract cannot be contradicted, varied, or explained by such oral negotiations. The difficulty with this contention is that it is not plaintiffs who are attempting to vary the terms of the written contract. The contract recites a down payment of $2,500, "receipt of which is hereby acknowledged." To establish the fact that the down payment was a condition precedent

to the formation of the contract, defendants must, of necessity, rely upon the oral negotiations of the parties prior to the signing of the written document. It is true that defendants claim that they stated at the time of the execution of the contract that such payment was to be a condition to the formation of the contract, but such claims are effectively refuted by the testimony of all other parties present, including attorney Sundberg, who assumed that the down payment had already been made when he drew the contract.

If defendants can use prior negotiations of the parties to show that the parties intended the down payment to be a condition precedent, it would be a strange rule which would forbid plaintiffs from using the same negotiations to refute such claim. If we were to hold that none of the prior negotiations could be proved, either to establish or refute the respective claims of the parties, then we would have a completely executed written contract which acknowledged receipt of the down payment. In view of the fact that the evidence is ample to justify a finding that nothing was said in Sundberg's office which would establish a condition precedent, there would then be nothing to contradict the express terms of the contract and on its face it would be complete and binding.

The rule is clear, however, that a written document, unconditional on its face and fully executed, can be shown by parol testimony to have been subject to a condition precedent. 3 Williston, Contracts (Rev. ed.) § 634; 3 Corbin, Contracts, § 589; Restatement, Contracts, § 241; 7 Dunnell, Dig. (3 ed.) § 3377.

In Minar Rodelius Co. v. Lysen, 202 Minn. 149, 152, 277 N. W. 523, 524, we quoted with approval the following statement of the rule found in 31 L.R.A. (N.S.) 619 and L. R. A. 1916B, 1039:

"It is a general rule that parol evidence is admissible to show that the parties made an agreement before or at the time a written instrument was entered into that it should become binding only upon the happening of a certain condition, the theory being that such evidence merely goes to show that the writing never became operative as a valid agreement, and that there is therefore no variance or contradiction of a valid written instrument."

■ Further, when oral evidence is admitted to show the existence of a condition precedent, it may be shown by similar evidence that the parties intended the written instrument to be complete and binding upon the execution thereof. In other words, proof of the existence of a condition precedent by oral testimony may be refuted by similar evidence. In determining the intent of the parties, what was said by one is as admissible as what was said by the other. Such evidence is admitted on the theory that it does not contradict or vary the terms of the written instrument at all but only bears on the question whether a contract ever came into existence. The court properly admitted oral evidence under this rule, both to show the existence of a condition precedent and the absence thereof. Implicit in the court's finding that there was a valid contract is a finding that there was no condition precedent to its formation. Such finding is amply sustained by the evidence as shown above.

■ The false recital of acknowledgment of receipt of the initial payment cannot be used by defendants to avoid the contract. Restatement, Contracts, § 243,[2] states the rule as follows:

"Where by the terms of an integration a certain fact is essential to the creation or continuance of an obligation and it is, to the knowledge of the obligor, falsely recited in the integration that the fact exists, the integrated agreement is not deprived of legal opera-

[2]"Illustrations:

"1. A, an insurance company, issues a fire policy to B, which provides that the premium is $100 and that the insurance company is not bound until the premium has been paid. The policy recites that the premium has been paid although in fact it has not been. A loss occurs during the term of the policy; A is liable to B. The recital precludes A from asserting the invalidity of the policy because of the non-performance of the condition of payment. B's acceptance of the policy justifies the inference of a promise on his part to pay the premium, supplying the legal requirement of consideration.

"2. In an integrated agreement A promises to sell Blackacre for $10,000, and B promises to pay that sum for it. It is further provided that the agreement shall have no effect until B pays $1000. There is a false recital that $1000 has been paid by B. A contract exists, but A's duty to transfer is conditional on the full payment by B of $10,000."

tion unless the existence of the fact is made essential by law independently of any agreement requiring it."

There can be little doubt that the parties could have incorporated into the contract a provision that the down payment could be made within a week after the execution of the contract. The evidence sustains the finding that it was their intention that the contract should be effective immediately.

Defendants next contend that M. S. A. 559.21 has no application (1) because the contract never came into existence for the reason that the $2,500 payment was a condition precedent, and (2) because the vendees had no equitable interest until they had made some payment on the contract. We have already disposed of the first argument. We do not agree with the second contention. The consideration essential to the validity of an agreement for the purchase or sale of land need not be paid at the time of making the agreement. The agreement of the vendee to pay in the future is sufficient consideration for the promise of the vendor to convey. 6 Dunnell, Dig. § 10002; 55 Am. Jur., Vendor and Purchaser, § 25. Once the contract has been established, its cancellation is governed by § 559.21. The equitable title of the vendee is established by the contract, not by the amount paid on it.

The balance of defendants' argument is predicated upon the assumption that payment of the $2,500 was a condition precedent to formation of the contract. Inasmuch as we hold that the evidence sustains the court's findings that it was not the intention of the parties that it should be a condition precedent, we need not pass upon arguments based on this erroneous assumption. Nor do we need to pass on the question of waiver. We find no reversible error.

Affirmed.