**CENTURY 21 ALL WESTERN REAL ESTATE AND INVESTMENT INC., a Utah corporation; Thomas C. Stubbs, Broker; Tom Stubbs and Ron Eisele, Plaintiffs and Appellants,**

v.

**Walter Reed WEBB and Kathleen Bruckman Webb, Defendants and Respondents.**

No. 17325.

Supreme Court of Utah.

March 23, 1982.

Thomas W. Seiler of Grow, Watson & Seiler, Orem, for plaintiffs and appellants.

Paul J. Merrill, Spanish Fork, for defendants and respondents.

OAKS, Justice:

This is a suit by a broker and buyers against the seller for specific performance, damages, and attorney's fees for the seller's refusal to proceed with the sale of her home pursuant to an "Earnest Money Receipt and Offer to Purchase" agreement signed by the parties. After a bench trial, the district court dismissed the plaintiffs' suit on the grounds that the signed agreement was invalid (1) for lack of consideration, (2) for the plaintiff buyers' failure to tender their own performance, and (3) because there was no meeting of the minds on an encumbrance in the seller's title.

On October 19, 1978, the seller signed a Sales Agency Contract with the broker, stating on the accompanying Listing Form that she owed $16,000 on the home and that her asking price was $33,000. On December 2, 1978, the buyers, two licensed real estate agents who worked for the broker, offered the seller $28,000 for the property. They communicated this offer by executing a conventional Earnest Money Receipt and Offer to Purchase, which was presented to the seller by Plowman, another employee of

the broker. The Earnest Money document, which stated that the buyers were "buying this property for their own use," specified that the purchase price would be payable $100 as a deposit ("receipt of which is hereby acknowledged"), $2,900 "on delivery of deed or final contract of sale which shall be on or before Dec. 22, 1978," and "$201.16 Principal and Interest each month commencing February 15th 1979 . . . until the balance of $25,000 together with interest [at 9%] is paid . . . ." By a typewritten addition, the Earnest Money offer provided that the buyers would "cash out sellers at the end of five years from closing date." The offer also specified an escrow account "to make the payments on the sellers' contract."

The buyers and the broker were aware at the time of the offer that the seller was purchasing the subject property on a contract whose unpaid balance was approximately $16,000. The offer made no specific mention of this obligation or any other, but provided that all "mortgages, chattel liens and other liens, encumbrances or charges against the property of any nature shall be paid by the seller . . . ." When she received this Earnest Money Receipt and Offer to Purchase, the seller made two additions (pertaining to the home being sold "as-is" and releasing seller from all maintenance responsibility as of the closing date) and signed the document. The buyers then initialled the additions, dating their action December 4, 1978.

At the time this contract was signed, the seller was indebted to Citicorp Person-to-Person Financial Center in the amount of $5,000, secured by her assignment to Citicorp by an instrument dated and recorded July 19, 1978, of all her interest in the real estate contract by which she was purchasing the subject property. The evidence was in conflict on when the buyers learned of this encumbrance. Both buyers and the broker's employee, Plowman, testified that they first learned of the Citicorp obligation when it showed up on the title report, which was dated December 5, 1978, and received at about that time. But the seller testified that she advised Plowman of this

encumbrance when she signed the listing contract with the broker. Interpreting the evidence in the light most favorable to the prevailing party, we assume that the trier of fact found that the broker was aware of the Citicorp encumbrance at the time the listing contract was signed. The buyers admittedly learned of the encumbrance from the title report no later than about December 5th.

What happened after December 5th is essentially uncontested. At the instance of the buyers, Plowman contacted the seller and advised her that the Citicorp lien would have to be discharged "in order [for her] to sell the home. . . ." At trial, one of the buyers explained their position at this time as follows:

Well on an assignment of contract you actually assign the property over to another individual or corporation which gives them the only right to sell the property and Mrs. Webb had no legal or right in my opinion to sell the home without first clearing off that assignment.

On her part, the seller took the position that the Citicorp obligation had to be entirely paid or she would not close the transaction. (She testified that she had advised Plowman of this fact at the time she signed the listing contract.) The seller advised Plowman that she did not have enough money to retire the obligation, and the buyers' down payment was not sufficient. Apparently in response to this advice, the buyers had Plowman propose to the seller early in December that they make a larger down payment to help her pay off the Citicorp obligation, but the proposed additional amount (which does not appear in the record) apparently did not meet the seller's demand that Citicorp be paid down to zero, so that effort came to naught.

The parties had no further communications prior to the agreed closing date of December 22. Neither party made a tender of performance on or before that date. On January 9, 1979, a lawyer representing the buyers and the broker wrote the seller advising that the buyers were "ready and

willing to close on this transaction," and requesting that the seller "immediately perform pursuant to [her] obligations under the Earnest Money agreement." The Citicorp encumbrance was not mentioned in this letter. Thereafter, the buyers and the broker brought this suit seeking specific performance of the Earnest Money agreement, damages, broker's fee, and attorney's fees.

■ We cannot agree with the district court's holding that the Earnest Money agreement failed for lack of consideration because the seller (as she testified) never received the $100 deposit. Apart from the fact that the seller signed an Earnest Money agreement that acknowledged the receipt of $100, the agreement contained mutual promises, which provide adequate consideration to make the agreement binding. *Mortgage Investment Co. v. Toone*, 17 Utah 2d 152, 406 P.2d 30 (1965); *Craigmile v. Sorenson*, 239 Minn. 383, 58 N.W.2d 865 (1953); *Thomsen v. Glenn*, 81 Nev. 56, 398 P.2d 710 (1965).

We are, however, in agreement with the district court's dismissing this suit on the basis that the buyers failed to tender their own performance before or at the time of bringing suit.

This is not a case like *Circle T Corp. v. Crocker*, 155 Colo. 263, 393 P.2d 744 (1964), cited by plaintiffs, where the buyers were not obligated to tender their own performance because the seller had clearly repudiated the contract. Here, it is impossible to separate (1) the seller's "repudiation" by refusing to proceed with the closing until the Citicorp encumbrance was entirely cleared, from (2) the buyers' prior position that the seller could not sell the property until that same condition was satisfied.

■ Since the seller had signed an Earnest Money agreement making no mention of the Citicorp encumbrance and specifying a down payment smaller than the amount of the encumbrance, she could not later make the buyers' payment of the Citicorp obligation a condition to her proceeding with the closing. On the other hand, in the absence of a contract provision granting such a right, the buyers had no legal right to insist that the seller totally satisfy the Citicorp encumbrance before the delivery of the final contract of sale. *Cf. Neves v. Wright*, Utah, 638 P.2d 1195 (1981). On the basis of the agreed sale price, the seller apparently had an equity in the subject property (after deducting the $16,000 balance due on her purchase contract and the $5,000 owed to Citicorp) of $7,000, less expenses of sale. That amount appears to provide an adequate margin of security for the purchase of a property valued at $28,000, especially since the buyers under this contract could use the agreed escrow to assure that their net down payment and all of their monthly payments were used to reduce the encumbrances on the property. Consequently, in the circumstances of this case, the Citicorp encumbrance could be accommodated within the terms of the parties' valid written agreement. This is not a case where there was no contract because the parties failed to have a meeting of the minds.

The parties were deadlocked in the week preceding the agreed closing date, both having taken a position of doubtful validity on the law or the facts. Both parties insisted that the Citicorp encumbrance be cleared by the other in advance of the closing, buyers because they thought this was their legal right, and seller because the buyers were insisting upon clearance and because she had made this an oral addition to the contract. This is precisely the sort of deadlock meant to be resolved by the requirement of tender.

■ In a case like this, where the executory contract contains no declaration that time is of the essence, the contract obligations can continue for some time beyond the agreed closing date. *Huck v. Hayes*, Utah, 560 P.2d 1124 (1977).[1] During the executo-

---

1. Where the contract states that time is of the essence, cases hold that both parties are discharged from their contract obligations if neither makes tender by the agreed closing date. *Triton Realty Co. v. Frieman*, 210 Md. 252, 123 A.2d 290 (1956); *Usinger v. Campbell*, 280 Or.

ry period of a contract whose time of performance is uncertain but which contemplates simultaneous performance by both parties, such as the Earnest Money agreement involved in this case, neither party can be said to be in default (and thus susceptible to a judgment for damages or a decree for specific performance) until the other party has tendered his own performance. 6 *Corbin on Contracts* § 1258 (1962). In other words, the party who desires to use legal process to exercise his legal remedies under such a contract must make a tender of his own agreed performance in order to put the other party in default. *Huck v. Hayes, supra* ; 15 *Williston on Contracts* § 1809 (3d ed. W. Jaeger 1972).

To qualify under this rule, a tender, such as an offer to pay money, must be complete and unconditional. *Timpanogos Highlands, Inc. v. Harper*, Utah, 544 P.2d 481 (1975); *Zion's Properties, Inc. v. Holt*, Utah, 538 P.2d 1319 (1975). Against the background of the buyers' insistence that the Citicorp encumbrance be entirely satisfied before closing, buyers' counsel's letter of January 9, 1979, though made while the contract was still in effect, does not contain the terms necessary to make it an unconditional tender of performance. There was no other tender, either by separate communication or in the language of buyers' complaint. Consequently, buyers were not entitled to specific performance of the Earnest Money agreement, and their broker, not having provided a party who was ready, willing, and able to purchase the property from the seller, is not entitled to its commission.

The judgment dismissing plaintiffs' complaint is affirmed. Costs to respondent.

HALL, C. J., HOWE, J., and J. HARLAN BURNS, District Judge, concur.

STEWART, J., dissents.

751, 572 P.2d 1018 (1977); *Guillory Corp. v. Dussin Investment Co.*, 272 Or. 267, 536 P.2d 501 (1975); 6 Corbin on Contracts § 1258 (1962).