William R. KELLEY, Jr., Plaintiff and Petitioner,

v.

LEUCADIA FINANCIAL CORPORATION, a Delaware corporation, Defendant and Respondent.

No. 900187.

Supreme Court of Utah.

Dec. 31, 1992.

Rehearing Denied Feb. 10, 1993.

David R. Olsen, Charles P. Sampson, and Paul M. Simmons, Salt Lake City, for plaintiff.

John A. Snow and Kathryn H. Snedaker, Salt Lake City, for Leucadia Financial Corp.

R. Paul Van Dam and David W. Lund, Salt Lake City, for Dept. of Commerce.

D. Frank Wilkins, Salt Lake City and David W. Johnson, Park City, for amicus Utah Ass'n of Realtors.

STEWART, Justice:

This case presents the issue of whether a buyer of real estate can obtain specific performance of a standard Utah Earnest Money Sales Agreement against a defaulting seller.

First Security Bank (FSB) agreed to sell real property to William R. Kelley pursuant to a standard Earnest Money Sales Agreement.[1] FSB could not provide marketable and insurable title because of a boundary dispute. Kelley filed an action for a declaratory judgment and for specific performance of the agreement. The trial court entered an order directing FSB to convey the property to Kelley.

The court of appeals reversed the trial court, holding in an unpublished opinion that the terms of the standard Earnest Money Sales Agreement preclude a buyer from obtaining specific performance against a breaching seller. The court held that when a seller fails to provide a marketable and insurable title, the standard agreement limits the buyer to one of two remedies: (1) enforcement of the agreement, but only after the buyer tenders full payment of the contract price; or (2) rescission of the contract with a refund of the earnest money. We granted certiorari because of the potential effect of that ruling on real estate transactions using the standard Utah Earnest Money Sales Agreement.

On March 2, 1987, Kelley and FSB executed an earnest money sales agreement by which FSB agreed to sell residential property in Park City, Utah, to Kelley. Kelley paid $10,000 in earnest money to FSB and began liquidating some of his assets to obtain the balance due. The closing was set for April 20, 1987.

The agreement, written on a standard form, included the following general provisions: (1) The seller would furnish good and marketable title, subject to encumbrances and exceptions provided in the contract, "evidenced by a current policy of title insurance"; (2) if title insurance was unobtainable due to title defects, the buyer could elect to waive the defects or to terminate the agreement and have the earnest money refunded; and (3) time was of the essence. The seller added a handwritten provision stating that the property was sold " 'as is,' without warranty. Title conveyed by special warranty deed."

FSB acquired the property by quitclaim deed from the former owners, who had defaulted on loans secured by the property. The property, consisting of approximately thirteen acres, included a residence, a stream, and a spring. The stream fed a trout pond located in front of the house and provided irrigation water for the property.

After execution of the agreement, a survey revealed that FSB's quitclaim deed con-

---

1. On appeal, Leucadia has been substituted for FSB as defendant.

tained an erroneous property description, which misplaced a boundary line by 15.22 feet, thereby excluding the stream and spring. In an attempt to cure the defect, FSB asked the adjoining property owners, the Armstrongs, to convey the disputed property. The Armstrongs refused and cut off the water to the pond, causing it to dry up.

On April 22, 1987, two days after the specified closing date, FSB and Kelley agreed to extend the date to June 1, 1987, so that FSB could clear up the boundary problem. Thereafter, the parties agreed to extend the closing date to July 1, 1987, and then to August 31, 1987.

In July 1987, FSB filed a complaint against the Armstrongs to quiet title to the disputed portion of the property and to recover damages caused by vandalism. FSB informed Kelley that he need not retain an attorney because the bank would handle the litigation.

On September 4, 1987, four days after the last agreed upon closing date, FSB's attorney sent a letter to Kelley, demanding that he close the transaction by September 15, 1987. The letter stated that FSB would consider the agreement terminated if the closing was not consummated by the 15th and that FSB was ready and able to sell the property " 'as is' without warranty in accordance with the terms of the earnest money agreement." FSB also stated that it would not proceed with the Armstrong litigation and that it had only pursued the lawsuit because it was interested in closing the deal with Kelley and not because it had a legal obligation to deliver clear title. FSB offered to assign its rights in the Armstrong litigation to Kelley and recommended that Kelley obtain counsel. FSB also offered to refund Kelley's earnest money should he choose to "walk away from the deal."

Kelley, who was then living in Massachusetts, did not receive the letter until September 8, 1987. He immediately replied by telegram to FSB, stating that he would not abandon the deal. Kelley then retained counsel, who contacted FSB and requested copies of all documents relating to the boundary litigation. Kelley's counsel asked for a thirty-day extension of the closing date so that Kelley could evaluate the litigation and its effect on the value of the property. FSB agreed to extend the closing date only one week, to September 22, but stated that it would cooperate fully with respect to the litigation. Kelley's attorney, however, did not receive the necessary documents from FSB's attorney until October 15, 1987. Nevertheless, on September 22, 1987, Kelley's attorney wrote to FSB and tendered Kelley's performance. The letter stated that Kelley was ready, willing, and able to close and that the necessary funds had been transferred to Williamsburg Savings Bank in Salt Lake City to be paid at closing. The letter also stated that the "tender is conditioned only upon First Security honoring its obligations pursuant to the earnest money sales agreement and delivering the property free from those defects which it has undertaken to cure." On the same day, Kelley filed a complaint against FSB for a declaratory judgment, damages for breach of contract, and specific performance. Kelley's funds were subsequently deposited with the Summit County clerk.

On September 24, 1987, FSB executed a release of Kelley's $10,000 earnest money deposit, but Kelley refused to accept it. The next day, Leucadia Financial Corporation formally offered to purchase the property from FSB, and on November 2, 1987, Leucadia and FSB entered into an earnest money sales agreement. Leucadia purchased the property on November 25, 1987.

FSB moved to dismiss Kelley's complaint on the grounds that Kelley's tender was defective and specific performance was not a remedy available under the agreement. Kelley countered with a motion for partial summary judgment, asserting that he was entitled to specific performance and an abatement in the purchase price. The court denied FSB's motion to dismiss and

granted Kelley's motion for partial summary judgment, ruling that Kelley was entitled to specific performance. The court reserved for trial Kelley's claim for damages and an abatement in the purchase price. Kelley and FSB subsequently settled the abatement and damages issues, and the trial court entered a decree of specific performance directing FSB to convey the undisputed portion of the property by special warranty deed and the disputed portion by quitclaim deed.

The parties stipulated to substitute Leucadia for FSB and Leucadia appealed to this Court. Pursuant to Rule 42 of the Utah Rules of Appellate Procedure, we transferred the case to the court of appeals. The court of appeals held that Kelley was not entitled to the equitable remedy of specific performance because Kelley's remedies were limited by paragraphs G and H of the agreement. Given that ruling, the court of appeals did not decide whether Kelley's tender was legally sufficient.

## I. A BUYER'S RIGHT TO SPECIFIC PERFORMANCE UNDER THE STANDARD EARNEST MONEY SALES AGREEMENT

The terms of the standard Earnest Money Sales Agreement have been approved by the Utah Real Estate Commission and the Attorney General. With some exceptions not relevant here, real estate agents may fill out only those forms approved by the Utah Real Estate Commission and the Attorney General. Utah Code Ann. § 61–2–20 (1989). According to the Utah Association of Realtors, which appeared as amicus curiae, the standard form Earnest Money Sales Agreement is used in the majority of real estate transactions conducted by its members.

Paragraphs G and H, which deal with title inspection and title insurance, were construed by the court of appeals to provide a buyer's exclusive remedies against a breaching seller. *Kelley v. Leucadia Financial Corp.*, No. 880534–CA, slip op. at 3 (Utah Ct.App. Jan. 5, 1990). Paragraph G provides that if there are defects in the title that the seller does not cure, the buyer may declare the agreement null and have all monies returned. The last sentence of paragraph G states:

> If said defect(s) is not curable through an escrow agreement at closing, this Agreement shall be null and void at the option of the Buyer, and all monies received herewith shall be returned to the respective parties.

The court of appeals held that because Kelley had not declared the agreement null and void under paragraph G, his remedies were limited to those stated in paragraph H.

Paragraph H deals with title insurance and confers on the buyer a right to nonjudicial rescission if the agreed-upon title insurance is not provided. Paragraph H provides:

> If title insurance is elected, Seller authorizes the Listing Brokerage to order a preliminary commitment for a standard form ALTA policy of title insurance to be issued by such title insurance company as Seller shall designate. Title policy to be issued shall contain no exceptions other than those provided for in said standard form, and the encumbrances or defects excepted under the final contract of sale. *If title cannot be made so insurable through an escrow agreement at closing, the earnest money shall, unless Buyer elects to waive such defects or encumbrances, be refunded to Buyer, and this Agreement shall thereupon be terminated.*

(Emphasis added.) The court of appeals held that paragraph H allows a buyer either to (1) waive the title defect and pay the full purchase price or (2) rescind the agreement and receive a refund of his earnest money. Under that construction, Kelley's refusal to waive the title defects caused the agreement to terminate by its own terms.

■ Leucadia argues that Kelley is limited to the remedies set forth in paragraphs

G and H. That position is untenable. Paragraphs G and H do not purport to be exclusive remedies, nor do they in any way limit the traditional common law or equitable remedies available to a buyer. Rather, these provisions are designed to give buyers the right to walk away from the contract and obtain a refund of their earnest money without having to obtain judicial redress. Thus, the remedies set out in paragraphs G and H are for the sole benefit of the buyer.

A seller is not entitled to take advantage of a provision intended to benefit the buyer alone. *E.g., Ace Realty, Inc. v. Looney*, 531 P.2d 1377, 1380 (Okla.1975). *Ace Realty* construed a provision of an earnest money sales agreement similar to paragraph H. The court stated, "The contractual provision that title is to be good and merchantable or the contract will be void and the earnest money returned is for the benefit of the purchaser, rather than the seller." *Id.* The court then held that a seller could not avoid its contractual obligations under a provision clearly for the benefit of the buyer. *Id.* at 1381. Similarly, the court in *Reed v. Wadsworth*, 553 P.2d 1024, 1034 (Wyo.1976), held that the sellers of real property could not terminate an earnest money agreement under a provision permitting the buyers to demand a refund of their earnest money when the sellers had breached the contract. Accordingly, paragraphs G and H give the buyer the absolute right to rescind the agreement if the seller defaults, but they do not confer on a defaulting seller the right to compel the buyer to either terminate the agreement or pay full value notwithstanding the seller's defective performance.

Moreover, to construe paragraphs G and H as barring a buyer's right to specific performance would allow a seller to breach the contract without consequence, since the buyer's only remedy would be to rescind the agreement. Not only would a seller have no motivation to clear title, but the cost of clearing title would be shifted to a buyer determined to purchase the property.

Thus, Leucadia's construction would place buyers in a disadvantageous position relative to sellers and deny them traditional remedies, such as specific performance. The even-handed protection that a uniform contract form ought to give both parties would become, in effect, illusory.

Leucadia's position that paragraphs G and H provide exclusive remedies is also inconsistent with paragraph N, which makes clear that those provisions were not intended to be a buyer's sole remedy. Paragraph N deals generally with the remedies available in the event of a default by either the buyer or the seller. It states:

In the event of default by Buyer, Seller may elect to either retain the earnest money as liquidated damages or to institute suit to enforce any rights of Seller. In the event of default by Seller, or if this sale fails to close because of the nonsatisfaction of any express condition or contingency to which the sale is subject pursuant to this Agreement (other than by virtue of any default by Buyer), the earnest money deposit shall be returned to Buyer. *Both parties agree that should either party default in any of the covenants or agreements herein contained, the defaulting party shall pay all costs and expenses, including a reasonable attorney's fee, which may arise or accrue from enforcing or terminating this Agreement, or in pursuing any remedy provided hereunder or by applicable law*, whether such remedy is pursued by filing suit or otherwise.

(Emphasis added.) Paragraph N clearly contemplates that both buyers and sellers may pursue "any remedy provided hereunder or by applicable law." The language "any remedy ... under applicable law" means all applicable statutory, common law, and equitable remedies. Specific performance with an abatement in the purchase price has long been recognized as an appropriate remedy when a seller refuses to convey. *Castagno v. Church*, 552 P.2d 1282, 1284 (Utah 1976).

Buyers and sellers are, of course, at liberty to modify a standard agreement and

negotiate terms that limit or expand the remedies of one or both parties. There is no evidence here, however, to suggest that the parties intended to limit Kelley's remedies to preclude specific performance.

## II. TENDER

We now turn to the issue of whether Kelley made a timely and unconditional tender of his performance to FSB. The trial court found that Kelley made an unconditional tender. The court of appeals, however, did not address the issue because it held that paragraphs G and H controlled Kelley's remedies. The parties have briefed this issue, and we address it in the interest of judicial expediency.

▪ To obtain a decree for specific performance against a defaulting party, the aggrieved party must make an unconditional tender of the performance required by the agreement. *Century 21 All Western Real Estate & Inv., Inc. v. Webb*, 645 P.2d 52, 56 (Utah 1982); *see also Baxter v. Camelot Properties, Inc.*, 622 P.2d 808, 811 (Utah 1981); *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1322 (Utah 1975). Neither party to an agreement "can be said to be in default (and thus susceptible to a judgment for damages or a decree for specific performance) until the other party has tendered his own performance." *Century 21*, 645 P.2d at 56. In other words, "a party must make a tender of his own agreed performance in order to put the other party in default." *Id.; see also Fischer v. Johnson*, 525 P.2d 45, 46–47 (Utah 1974).

▪ The tender cannot impose on the other party a new condition or requirement not already imposed by the contract. *Century 21*, 645 P.2d at 56; *accord* 5A Arthur L. Corbin, *Corbin on Contracts* § 1233 (1964) [hereinafter "Corbin"]. If the law were otherwise, one could use a tender to compel the other party to comply with new contractual terms. Accordingly, a tender, as a general rule, must be unconditional.

A tender that contains an improper condition or requirement disqualifies a party from obtaining a decree of specific performance. *Baxter*, 622 P.2d at 811; *Century 21*, 645 P.2d at 56.. A party to a bilateral contract may, however, properly condition a tender on the other's performance, since such a condition does not impose a requirement beyond that already contained in the contract. 5A *Corbin* § 1233.

Leucadia argues that Kelley's tender was defective because Kelley's demand for a title free from the boundary defect was a new condition not contained in the agreement. Kelley responds that his demand did not impose a new condition on FSB, but insisted only that FSB do that which it had promised to do in the agreement and had, in fact, undertaken to do by filing the lawsuit against the Armstrongs.

Whether Kelley's demand that FSB cure the title defect constituted a conditional tender depends on whether the agreement already obligated FSB to do so. Paragraph 3 of the agreement states that the seller "agrees to furnish good and marketable title to the property, subject to encumbrances and exceptions noted herein." The primary obligation of a seller under an earnest money sales agreement is to provide marketable title. Marketable title is one that may be "freely made the subject of resale" and that can be sold at a "fair price to a reasonable purchaser or mortgaged to a person of reasonable prudence as security for the loan of money." 77 Am.Jur.2d *Vendor and Purchaser* § 131, at 313–14 (1975). Generally, when a seller agrees to convey marketable title, the seller must undertake to cure defects if it can be done in the exercise of reasonable diligence and within a reasonable time. *See, e.g., Ace Realty, Inc. v. Looney*, 531 P.2d 1377, 1380 (Okla.1975).

▪ The boundary dispute with the Armstrongs constituted a cloud on the title and adversely affected the value and marketability of the property, a fact FSB admitted in its complaint against the Arm-

strongs. FSB argued to the trial court that the " 'as is' without warranty" language in the handwritten notation referred to warranties of title and therefore released FSB from any obligation to resolve the boundary dispute. That argument is not valid. In the same notation, FSB agreed to convey the property to Kelley by special warranty deed. A special warranty deed, although not as broad as a general warranty deed, carries with it certain warranties of title. Therefore, the "as is" language did not modify FSB's express promise to convey marketable title.

FSB's own conduct and statements support this conclusion. FSB acknowledged its obligation to provide clear title when it undertook the Armstrong litigation and told Kelley that he need not retain an attorney. For a period of four months, FSB, by its actions and statements, led Kelley to believe that FSB would resolve the boundary problem and deliver clear and marketable title, as it was obligated to do under the contract. Not until its letter of September 4 did FSB disclaim any obligation to do what it had previously acknowledged. It was only then, and for the first time, that FSB stated that it had undertaken the litigation, not because it was obligated to, but because of FSB's interest in closing the deal with Kelley.

In view of FSB's express promise to provide clear and marketable title and its having undertaken litigation to do so, we hold that Kelley's tender did not impose a new condition, but was merely a request that FSB do what it was contractually obligated to do.

### III. TIMELINESS

Finally, Leucadia argues that Kelley cannot seek specific performance because time was of the essence and Kelley failed to tender his performance by the closing date. Because the closing date had been extended several times by mutual agreement, Kelley properly tendered his performance on September 22, the last agreed

upon closing date. We therefore reject FSB's argument.

The judgment of the court of appeals is reversed, and the trial court's judgment is affirmed.

HALL, C.J., and DURHAM, J., and GARFF, Court of Appeals Judge, concur.

ZIMMERMAN, J., having disqualified himself, does not participate herein; Garff, Court of Appeals Judge, sat.

HOWE, Associate Chief Justice (concurring):

I concur but write to point out an inconsistency between paragraph G and paragraph H of the agreement. The last sentence of paragraph G provides that if a defect in title is not curable through an escrow at closing, the agreement shall be null and void at the option of the buyer. The last sentence of paragraph H states that if title cannot be made insurable through an escrow at closing, the agreement shall be terminated unless the buyer elects to waive the defects or encumbrances. While paragraph G speaks of a "defect in title" and paragraph H deals with a "title that cannot be made so insurable," I believe that they both address the same thing. Yet in paragraph G, termination is at the option of the buyer, whereas in paragraph H, termination appears to be mandatory unless the buyer elects to waive the defects. It was here that the court of appeals was misled. It construed paragraph H literally instead of in light of paragraph G. Justice Stewart has properly reconciled the two paragraphs by holding that termination is intended to be at the option of the buyer.

I think the court of appeals also erred in that it did not consider whether the defect in title here could be cured through an escrow at closing as provided for in both paragraphs G and H. From all that appears in the record before us, a stipulated amount could have been withheld from the purchase price at closing and escrowed pending resolution of the boundary dispute.