Thomas CARR, Plaintiff and Appellant,

v.

ENOCH SMITH COMPANY, Defendant and Respondent.

No. 860001–CA.

Court of Appeals of Utah.

Oct. 18, 1989.

D. Kendall Perkins, Salt Lake City, for plaintiff and appellant.

---

Ronald E. Nehring, Salt Lake City, for defendant and respondent.

Before BENCH, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Appellant Thomas Carr appeals from a district court judgment dismissing his action and awarding attorney fees and costs to respondent Enoch Smith Company ("Smith"). We affirm the judgment, except as to the attorney fees.

With the exception of findings pertinent to the question of fees, the trial court's findings of fact are largely undisputed.[1] The facts recited here are therefore drawn, primarily, from the unchallenged findings.[2]

On March 29, 1978, Carr's uncle, expressly acting for Carr, entered into an "Earnest Money Receipt and Offer to Purchase" with Smith. Under the terms of the agreement, Carr agreed to purchase from Smith a home "to be built" at the Park Meadows development in Park City. The agreement recited that $1,000 of the total purchase price had been paid, with the balance due "when complete." This phrase was added to the pre-printed form: "Subject to buyer receiving a primary residence loan."

Between execution of the earnest money agreement and the following fall, Smith's real estate agent communicated with Carr's uncle concerning the progress being made by Carr in connection with securing his "primary residence loan." During these dozen or so conversations, Carr's uncle did not divulge Carr's address and phone number, but agreed to relay any necessary information to Carr. Ultimately, Smith's agent advised Carr's uncle that unless Carr

made meaningful attempts to secure a loan, Smith would no longer consider appellant a serious buyer. Meanwhile, Carr made a couple of applications for a loan with one lending institution. In April 1979, the institution requested additional information in order to proceed with the loan approval process. Carr responded seven months later. No loan was ever approved.

Carr lived out of state but visited Park City in November and December of 1978. During those visits, he did not visit the site to inspect the progress of the house. Prior to completion, and without any notice to Carr directly or through his uncle, Smith revised the course of construction to make the home suitable for use as a model.[3] The home was completed not later than December 1978.

Carr at no time, either before or after construction was completed, tendered the balance of the purchase price to Smith. In January, the $1,000 earnest money deposit was returned to Carr's uncle. On May 3, 1979, Carr's attorney sent a letter to Smith's real estate agent, Gump & Ayers, expressing Carr's intent to perform under the terms of the contract. Smith's attorney replied that his client considered the agreement to have been terminated by Carr's failure to attain the loan. Six months later, this action for specific performance was commenced.

A two-day trial to the court was held in December 1982. The court ruled in favor of Smith, concluding that the subject-to-financing clause was a condition precedent which Carr was obligated to satisfy within a reasonable time. Since he failed to do so, the trial court concluded Smith was excused from its obligations under the contract.

---

1. Carr argues that findings should have been made concerning the date on which the house was "committed" for use as a model home. Because our decision turns on the issue of tender, any error in failing to make a finding as to that date is inconsequential.

2. The findings of fact initially adopted by the trial court were protested by Carr, who filed a detailed written objection to most of the findings. The court and counsel reviewed the initial findings and Carr's objection, "item by item,"

and amended findings resulted. It is the amended findings which are our starting point.

3. Thus, Smith made the usual choices concerning carpet, drapes, cabinets, and appliance color rather than soliciting Carr's preferences. In addition, glass was substituted for a garage door, the area intended for automobile storage was converted to a showroom, and three phone lines were installed.

The court also found that the earnest money agreement was ambiguous as to the circumstances under which the court should award costs and attorney fees. However, it found that the parties had stipulated that the prevailing party in the action would be awarded costs and fees. Therefore, the court awarded costs and attorney fees to Smith.

Following the disposition of various post-trial motions, notice of appeal was timely filed in May 1983. Briefing, however, was not completed until September 1984. The appeal was subsequently transferred to this court and had the distinction of being the first case on our docket. Prior to the March 1987 date initially set for oral argument, the successor to Smith became the subject of a bankruptcy proceeding. The "automatic stay" provided by 11 U.S.C. § 362 precluded Carr from proceeding with the appeal. Recently, Carr was granted relief from the automatic stay to pursue this appeal, which was finally argued last month and is ready for decision—ten years after the dispute first arose.

Numerous issues are raised on appeal. However, in light of our disposition, it is unnecessary to address anything but the issues of tender and attorney fees. We approach the case with recognition that

> [s]pecific performance is a remedy of equity which is addressed to the sense of justice and good conscience of the court, and accordingly, considerable latitude of discretion is allowed in determination as to whether it shall be granted and what judgment should be entered in respect thereto; and ruling thereon should not be upset on appeal unless it clearly appears that he has abused his discretion....

*Morris v. Sykes*, 624 P.2d 681, 684 (Utah 1981) (suit for specific performance of contract to purchase land). *See also LHIW, Inc. v. DeLorean*, 753 P.2d 961, 963 (Utah 1988).

One of the pivotal findings of the trial court, and an issue that Smith raises again on appeal, is the fact that Carr never tendered the balance required by the earnest money agreement. The requirement of a tender is well-established:

> During the executory period of a contract whose time of performance is uncertain but which contemplates simultaneous performance by both parties, such as the Earnest Money agreement involved in this case, neither party can be said to be in default (and thus susceptible to a judgment for damages or a decree for specific performance) until the other party has tendered his own performance.

*Century 21 All Western Real Estate & Inv. v. Webb*, 645 P.2d 52, 55–56 (Utah 1982). Consequently, Smith argues that Carr was not entitled to maintain this action. In response, Carr makes two arguments. First, he argues that tender was made in the May 3, 1979, letter expressing his intent to perform the contract. Second, he argues that tender was excused because the property had already been "committed" to Gump & Ayers to be used as a model home.

█ There is no merit to Carr's first argument. In order to have a valid tender, there must be "a bona fide, unconditional, offer of payment of the amount of money due, coupled with an actual production of the money or its equivalent." *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1322 (Utah 1975). It is not enough to simply inform the seller that the buyer is ready and willing to perform the contract as planned. *Century 21*, 645 P.2d at 54–56. *See Fischer v. Johnson*, 525 P.2d 45, 47 (Utah 1974) (appellant did not satisfy tender obligation "by simply serving [a] notice of willingness to go forward"); 74 Am.Jur.2d *Tender* § 7 (1974). The letter of May 3 from Carr's attorney to Gump & Ayers at most expressed a desire on the part of Carr to go forward. Additionally, Carr never actually obtained the loan that was apparently necessary for him to fulfill his contractual obligation and enable him to make a proper tender of his performance. Under these circumstances, the May 3 letter cannot be viewed as satisfying the tender requirement.

█ Alternatively, Carr asserts that tender would have been futile because re-

spondent had "committed" the property to Gump & Ayers prior to its completion. He argues that this act was a repudiation of the contract and consequently excused him from the obligation to tender. We are not persuaded by this argument. It is true that

> [t]he familiar rule that the law does not require one to do a vain or useless thing excuses the making of a formal tender which would otherwise be required, where it is reasonably plain and clear that if made, such a tender would be an idle ceremony and of no avail, as where it appears that a tender, if made, will be refused for some reason unrelated to the tender or its sufficiency....

74 Am.Jur.2d *Tender* § 4 (1974). *See Circle T Corp. v. Crocker,* 155 Colo. 263, 393 P.2d 744, 745 (1964) (en banc) (cited in *Century 21,* 645 P.2d at 55). However, the record is not so "reasonably plain and clear" as to demonstrate that tender would have been a futile act. It appears from the record that the house remained in use by Gump & Ayers throughout 1979, but was not placed beyond the control of Smith until some time later. From all that appears, title was never conveyed to Gump & Ayers, and Gump & Ayers' use of the home as a model was at the pleasure of Smith.

Although there were some fairly significant modifications to the house in order to convert it to a model, there is no evidence in the record to suggest that appropriate corrections could not have been expeditiously made if Smith's performance became necessary.[4] An actual tender of the required sum would have placed Smith in the position of choosing to perform or risking a default. The very purpose of tender is to place the seller in this position. *See* 74 Am.Jur.2d *Tender* § 2 (1974). Without the formal act of tender, we are left having to speculate about how Smith might have responded. Avoidance of such guesswork is one of the primary benefits of actually tendering one's performance and is a sound

reason for rather strict adherence by the courts to the tender requirement. Carr's duty to tender was neither performed nor excused. It follows that he was not entitled to prevail in this action.

■ All of that having been said, it should be observed, lest our decision be thought to rest on a hypertechnicality, that even if Carr were somehow able to surmount the "no tender" hurdle, it is unlikely he would prevail. The Utah Supreme Court has noted that

> specific performance is a remedy of equity; and one who invokes it must have clean hands in having done equity himself. That is, he must take care to discharge his own duties under the contract; and he cannot rely on any mere inconvenience as an excuse for his failure to do so. Even if inconvenience or difficulty is encountered, he must make an effort to perform, or to tender performance, which manifests reasonable diligence and a bona fide desire to keep his own promises.

*Fischer,* 525 P.2d at 46–47. *See also Bradford v. Alvey & Sons,* 621 P.2d 1240, 1242 (Utah 1980).

The record suggests that Carr did not take his obligations under the contract very seriously at all—at least not until property values in Park Meadows skyrocketed. He not only delayed in obtaining the loan, but in fact never obtained it. He did not communicate with the seller during the course of construction as a concerned buyer would be expected to do. Indeed, when in the area on a couple of occasions, he did not take the time to visit the property and inspect the home's progress. These facts were important to the trial court in its decision to deny specific performance. The court concluded that Smith "was excused from performing its duties [under the contract] by reason of plaintiff's conduct, especially plaintiff's failure to secure financing within a reasonable time." In essence, the

---

4. Carr's protest about the extent of the changes in making the home a model, and their irretrievable nature, rings somewhat hollow in view of the fact he sought specific performance rather than damages. Since a model home used in

selling other property would have done Carr no good, the remedy he selected suggests he believed that the changes necessary to make the model into a liveable residence would not have been terribly onerous.

court concluded that Carr had not been reasonably diligent, nor had he demonstrated a desire to *timely* perform his own obligations.

As mentioned above, we accord the trial court considerable latitude in determining when specific performance is an appropriate remedy. In light of the foregoing, we do not believe that the trial court abused its discretion in refusing to grant specific performance. On the contrary, the court's judgment is fair and sensible under the circumstances. Consequently, we affirm the court's decision to deny Carr any relief.

■ We do, however, find error in awarding attorney fees in favor of Smith. "The general rule in Utah is that attorney fees cannot be recovered absent statutory authorization or contract." *Cooper v. Deseret Fed. Sav. & Loan Ass'n*, 757 P.2d 483, 486 (Utah Ct.App.1988). *See also Mecham v. Benson*, 590 P.2d 304, 309 (Utah 1979). Moreover, where a contract provides for attorney fees, they are awardable only on the terms and to the extent authorized in the contract. *Turtle Management, Inc. v. Haggis Management, Inc.*, 645 P.2d 667, 671 (Utah 1982).

■ The provision in the earnest money agreement regarding attorney fees is not comprehensive but is somewhat limited in scope. With our emphasis, it provided: "If either party fails [to perform], he agrees to pay all expenses of *enforcing this agreement,* or of any right arising out of the breach thereof, including a reasonable attorney's fee." Smith took an entirely defensive posture. It was not enforcing any right arising under the agreement or arising from a breach thereof. On the contrary, its position at trial was that there was no viable contract left to enforce. While Smith would surely be entitled to

attorney fees under the more typical provision awarding fees to the prevailing party, *see generally Mountain States Broadcasting Co. v. Neale*, 776 P.2d 643, 648–49 (Utah Ct.App.1989), *modified,* 113 Utah Adv.Rep. 41, —— P.2d —— (Ct.App.1989), it is not entitled to attorney fees under the provision at issue.[5] Nor does the record support a finding of any express stipulation to modify the attorney fee provision contained in the agreement. *Cf. Mecham,* 590 P.2d at 309 (stipulation concerning fee award invalid where inconsistent with contract). We therefore reverse the trial court decision as it relates to attorney fees.

The judgment appealed from is affirmed except that the award of attorney fees in favor of respondent is vacated. The parties shall bear their own costs of this appeal.

BENCH and JACKSON, JJ., concur.

---

5. In view of the vintage of the contract at issue in this action, we need not consider the effect of Utah Code Ann. § 78–27–56.5 (1987). That provision speaks in terms of "[r]eciprocal rights to recover attorney's fees" and permits the court to award attorney fees to the prevailing party when a contract allows "at least one party to recover attorney's fees." *Id.* However, the provision is inapplicable to cases involving contracts executed before April 29, 1986. *Id. See Cobabe v. Crawford,* 780 P.2d 834, 836 n. 2

(Utah Ct.App.1989). *See also White v. Fox,* 665 P.2d 1297, 1300 (Utah 1983). We would observe that the instant fee provision, although not comprehensive in scope, is reciprocal in the sense that either buyer or seller would recover its fees if it successfully sued to *enforce* the contract, while both buyer and seller would be left to absorb their own fees if instead one party merely resisted successfully an action to enforce the contract brought by the other party.