Joseph W. SHIELDS, Plaintiff
and Appellee,

v.

Arvil A. HARRIS, Defendant
and Appellant.

No. 950680–CA.

Court of Appeals of Utah.

March 6, 1997.

James L. Christensen and Susan J. Mueller, Salt Lake City, for Defendant and Appellant.

Richard K. Nebeker and Stacey G. Schmidt, Salt Lake City, for Plaintiff and Appellee.

Before BENCH, BILLINGS and ORME, JJ.

## OPINION

BILLINGS, Judge:

Appellant Arvil A. Harris appeals the trial court's grant of specific performance of an "Option to Buy" agreement that required Harris to sell his real property to Appellee Joseph W. Shields. We affirm.

## FACTS

Harris is the owner of 320 acres of property in Duchesne County, Utah. In April 1985, Harris leased this property to Shields for five years. In February 1987, the parties agreed to terminate the five-year lease because both parties were interested in a sale of the property or a longer-term lease. As an inducement for Shields to enter into a long-term lease, Harris executed an "Option to Buy" agreement and delivered it to Shields. The agreement provided:

A. Lessee, Joseph W. Shields would have this Special option to buy said ranch from Lessor Arvil A. Harris for a reasonable price to be negotiated by five independent people, one man from the Federal Land Bank, one man from the Soil Conservation Service in Roosevelt, Utah office, one banker from the First Security Bank of Utah loan department, Roosevelt, Utah, one farmer in the Myton, Utah area, and one real estate broker in the Myton or Roosevelt area. These five people would make a fair study at the time of purchase to make an honest and fair appraisal of the ranch. All five bids would be added up for a grand total and divided by five to arrive at a selling price.

B. A special consideration would be given to Joseph W. Shields in that $5,000.00 per year would be given toward the down payment at any year during the course of the seven year lease. For example, if you choose to buy the seventh year of the lease $35,000.00 would be allowed as a down payment toward the purchase price of said ranch. Said price of the ranch would be based on the appraisal of the five people mentioned in Paragraph A. If for example, the average of these five appraisals came to $300,000, then you could apply the $35,000.00 as part of the down payment. The balance due would be $265,000.00.

About this time, Shields filed a bankruptcy petition. Approximately ninety days later, the bankruptcy proceedings were dismissed. Harris and Shields then entered into a ten-year lease, which was to run from May 1, 1987, through May 1, 1997, with annual payments of $13,000. The ten-year lease does not reference the Option to Buy agreement.

Shields began farming the land and made all payments to Harris pursuant to the lease terms. In spring 1993, Harris offered to buy out the remainder of Shields's lease because he wanted to sell the property to Burton Dairy. To prevent Harris from selling the property, Shields attempted to exercise the Option to Buy. Pursuant to the option's terms, Shields obtained four appraisals—an appraisal from the Soil Conservation District was not possible. Shields then mailed a letter, dated August 2, 1993, to Harris's attorney communicating his intention to exercise the option. Shields asserted he had obtained the four available appraisals and that he was ready, willing, and able to purchase the property. Shields, however, did not tender the purchase money. After learning Shields had obtained appraisals, Harris procured two appraisals of his own.

Before Shields instituted this action, Harris wrote two letters, dated November 5 and 12, 1993, to Shields and Shields's attorney regarding the sale of the property. Harris was adamant in these letters that he would not sell the property to Shields for less than $265,000.

Shields instituted the present action for specific performance of the Option to Buy, and a two-day bench trial was held. The trial court found the Option to Buy enforceable and did not require Shields to tender the purchase amount "because the formula for finalizing the purchase price could not be completed without the cooperation of both parties."

The court then averaged the various appraisals to determine the purchase price. The court ordered Harris to provide good and marketable title and to sell the property to Shields for $202,125, less credits and liens. The court further ordered the sale to occur "within such period of time as demanded by the plaintiff, but not to exceed the date of the real property lease." Harris appeals.

## ANALYSIS

Harris appeals the trial court's grant of specific performance of the Option to Buy, claiming the trial court should not have excused Shields's failure to tender the purchase money. In addition, Harris argues the court improperly allowed the closing to occur at any time prior to the expiration of the ten-year lease when the option refers to only a seven-year lease.

■ We will overturn a grant of specific performance only if we find an abuse of discretion. *Carr v. Enoch Smith Co.*, 781 P.2d 1292, 1294 (Utah.Ct.App.1989). " '[S]pecific performance is a remedy of equity which is addressed to the sense of justice and good conscience of the court, and accordingly, considerable latitude of discretion is allowed [the court's] determination as to whether it shall be granted and what judgment should be entered....' " *Id.* (quoting *Morris v. Sykes*, 624 P.2d 681, 684 (Utah 1981)).

## I. Tender

■ Harris contends Shields's failure to make a valid tender of the purchase price precludes specific enforcement of the Option to Buy agreement. Section 78–27–1 of the Utah Code provides "[a]n offer in writing to pay a particular sum of money ... is, if not accepted, equivalent to the actual production and tender of the money." Utah Code Ann. § 78–27–1 (1992). Utah courts have interpreted this provision to mean a valid tender requires an "obligor [to] make a bona fide, unconditional, offer of payment of the amount of money due coupled with an actual production of the money or its equivalent." *Jenkins v. Equipment Ctr., Inc.*, 869 P.2d 1000, 1003 (Utah.Ct.App.1994); *see also Mills v. Brody*, 929 P.2d 360, 363 (Utah.Ct. App.1996). "It is not enough to simply inform the seller that the buyer is ready and willing to perform the contract as planned." *Carr*, 781 P.2d at 1294; *see also Mills*, 929 P.2d at 363.

■ However, in this case, Shields does not claim an actual tender was made. Rather, he claims tender would have been a futile act and therefore should be excused. "Tender is excused where 'it is plain and clear that a tender, if made, "would be an idle ceremony and of no avail." ' " *Jenkins*, 869 P.2d at 1003 (quoting *Fitzgerald v. Corbett*, 793 P.2d 356, 359 (Utah 1990) (quoting 74 Am.Jur.2d *Tender* § 4 (1974))); *accord Hansen v. Christensen*, 545 P.2d 1152, 1154 (Utah 1976); *Carr*, 781 P.2d at 1295. This court has held "tender to be fruitless and thus excused where the lienor states that he or she does not intend to accept payment, [and] where the lienor claims a larger sum than he or she is entitled to collect." *Jenkins*, 869 P.2d at 1003 (citations omitted). If a demand for " " "a larger sum is so made that it amounts to an announcement that it is useless to tender a smaller sum, it dispenses with" ' " the tender requirement. *Id.* (quoting *Simons v. Brashears*, 344 P.2d 1107, 1112 (Okla.1959) (citation omitted)). Additionally, "[w]here the unreasonable conduct of the obligee would make an actual tender a fruitless gesture, an offer to comply with the terms of the contract by the obligor is sufficient." *Hansen*, 545 P.2d at 1154.

■ This case falls squarely within the recognized exceptions to the tender requirement. Shields argued at trial and on appeal that Harris's two letters, refusing to sell the property for the amount of the average of the appraisals, excused Shields from tendering the purchase money. In the November 5 letter to Shields, Harris's exact language was as follows:

> No Judge in the State of Utah would ever make me sell My ranch for less than $265,-000.00—that is My price to you, take it or leave it.

The November 12 letter to Shields's attorney stated:

> And No Way in Hell, will the Judge make me sell the Ranch for less than $270,-000.00. I told you and I have told Joe— He can have it for $265,000.00 take it or leave it.
>
> . . . .
>
> You might as well tell [Shields], I'm *firm* in what I want. ($265,000.00 and Not a penny less).

Harris wrote and sent both of these letters before Shields instituted this action for specific performance and thus at a time when Shields could have still tendered the money. In addition, Harris's letters make plain and clear that he would refuse to accept any amount under $265,000, which would include Shields's offer to purchase made in substantial conformity with the Option to Buy. Under *Hanson*, an unreasonable refusal on Harris's part makes Shields's offer to comply with the terms of the option sufficient to support specific performance. Therefore, we conclude the record as a whole clearly demonstrates Shields's tender of an amount arrived at under the Option to Buy would have been to no avail. We thus affirm the trial court's conclusion that tender of the purchase price was unnecessary.

## II. Option Terms

■ Next, Harris claims the court erred in granting specific performance inconsistent with the terms of the parties' option agreement.[1]

■ Harris argues that because the court found the option clear and unambiguous the court should not have proceeded to admit extrinsic evidence to determine the period of time in which the option could be exercised. However, the court found the option agreement was "definite and enforceable," not clear and unambiguous. A contract can be specific enough to be enforceable, but still need parol evidence admitted to effectuate its terms. *See Krauss v. Utah State Dep't of Transp.*, 852 P.2d 1014, 1019 (Utah.Ct.App.1993); *Property Assistance Corp. v. Roberts*, 768 P.2d 976, 977–78 (Utah. Ct.App.1989).

Further, Harris did not argue below that parol evidence should not have been admitted. In fact, both parties introduced parol evidence as to the parties' intent and understanding of their agreements. In *Co-Vest Corp. v. Corbett*, 735 P.2d 1308 (Utah 1987), the trial court was faced with the construction of a written document, and both sides offered parol evidence without objection. The trial court ruled against Corbett concerning the meaning of the document. *Id.* at 1309. On appeal, he claimed the document was clear and unambiguous and not subject to interpretation with extrinsic evidence. Our supreme court ruled that because Corbett did not object to the parol evidence at trial, he could not assert that ground as error on appeal. *Id.*

Similarly, Harris cannot argue the court was limited to the four corners of the document after his failure to object to the introduction of, and his ability to offer, parol evidence at trial. The trial court found the terms of the option agreement definite enough to be enforceable and allowed in ex-

---

1. Shields contends this claim was not raised at trial and we therefore should not consider it for the first time on appeal. An issue is properly raised if it puts the judge on notice of the error and allows the court an opportunity to correct it. *State v. Brown*, 856 P.2d 358, 359 (Utah.Ct.App. 1993). We agree that Harris's argument that the option was enforceable for only seven years under a non-existent lease was never raised at trial or in an appropriate post judgment motion. We reach the merits only because Harris claims he was surprised by the ten-year term in the trial court's judgment and had no opportunity to object in the ordinary course of events.

trinsic evidence to effectuate the terms of the agreement in accordance with the parties' intent. The court's ultimate determination that the option was tied to the parties' lease, whatever its length, was supported by ample testimony. Shields repeatedly testified that he understood the Option to Buy came with the ten-year lease ultimately entered into, even though the parties' previous discussions contemplated a lease of shorter duration.

Further, under established Utah law, when two agreements are "executed 'substantially contemporaneously and are clearly interrelated, they must be construed as a whole and harmonized if possible.'" *Winegar v. Froerer Corp.*, 813 P.2d 104, 109 (Utah 1991) (quoting *Atlas Corp. v. Clovis Nat'l Bank*, 737 P.2d 225, 229 (Utah 1987)); *accord Cox v. Cox*, 877 P.2d 1262, 1268–69 (Utah.Ct.App. 1994); *HCA Health Servs. v. St. Mark's Charities*, 846 P.2d 476, 484 (Utah.Ct.App. 1993). Substantial evidence supports the trial court's finding that the agreements were substantially contemporaneous. Both parties testified the option was an inducement for Shields to either purchase the property or enter into a ten-year lease. Also, although the option was prepared at the same time Shields filed for bankruptcy, the lease was prepared immediately after Shields's bankruptcy was dismissed. Furthermore, Harris testified the reference to seven years in the option was just an example and the option did not tie into any particular lease because no lease was in existence at the time. This testimony, coupled with the fact that there was no time limit in the option, would be consistent with a determination that the option was tied to the subsequent ten-year lease. Moreover, Shields expressly testified he understood the option was tied to the ten-year lease. Therefore, we conclude the trial court correctly harmonized the option and lease agreements and concluded the option should run for the duration of the ten-year lease.

## CONCLUSION

We conclude Shields's failure to tender the purchase money was excused by Harris's clear refusal to accept the amount Shields proposed in accordance with the parties' option agreement. In addition, we conclude the trial court correctly harmonized the terms of the Option to Buy and ten-year lease agreement. Therefore, the trial court did not abuse its discretion in granting specific performance of the Option to Buy during the term of the ten-year lease. Accordingly, we affirm.

BENCH and ORME, JJ., concur.