Lawrence J. **BELL**, Anita J. Bell, Plaintiffs and Appellants,

v.

Reed A. **ELDER**, Ronald O. Elder, and Allen G. Elder, dba City of Enoch, Ltd., Defendants and Respondents.

No. 880202–CA.

Court of Appeals of Utah.

Nov. 3, 1989.

## OPINION

Before BULLOCK, Senior District Judge,[1] and JACKSON and ORME, JJ.

J. ROBERT BULLOCK, Senior District Judge:

Plaintiffs Bell appeal from a judgment dismissing their claims for rescission of a contract to buy real property and for restitution of the amounts paid thereunder. We affirm.

The Bells and other persons surnamed Waldron (the Waldrons are not parties to this action) contracted in 1977 to purchase ten acres of undeveloped land from a partnership comprised of the defendants (Elders) for a total of $25,000. Part of the price was paid at closing, with the remainder to be paid later. The Bells were to convey legal title on receipt of payment in full.

---

1. J. Robert Bullock, Senior District Judge, sitting by special appointment pursuant to Utah Code Ann. § 78–3–24(1)(j) (1987).

The land sold was zoned for agricultural use at the time of the contract, with no more than one residence per ten-acre parcel permitted. The parties had hopes of developing the area more extensively than the zoning then permitted, but their hopes did not prove feasible. Property values in the area have generally declined since the contract was made.

The contract was reduced to writing by filling in a pre-printed form entitled "Uniform Real Estate Contract," into which the following typewritten words were inserted:

The Seller [Elders] hereby agrees and warrantys [sic] to furnish water and electrical power [and] roads to this Property by July, 1978. If Buyer is unable to obtain [a] building permit by July, 1978, the seller agrees to endemnify [sic] and repay this contract within 6 months.

This insertion in the original contract was the subject of a "Supplimental [sic] Agreement" dated November 3, 1978, which read as follows:

Because of unforeseen circumstances that have arisen with regard to furnishing utilities to the [subject] property, the following Supplimental [sic] Agreement is added.... It is now understood and agreed that the Sellers ([Elders]) at their expense will furnish to each of [2 5–acre] plots,[2] the culinary water, electrical power, and roads. That Buyer is to pay $1,000 hook-up and installation fee for culinary water. The fee to be paid at the time of home construction and no fees payable for electrical power or roads, to property fade lines.

If Buyers should sell any lots from their 5[–]acre plots, then and in this event a $4,000 utilities improvement fee is payable to Sellers at the time of sale for each and every lot sold. This pays for the utilities, roads, electrical power and culinary water. Buyers of these lots

would pay in addition $1,000 culinary water hook-up and installation fee.

Sellers ([Elders]) hereby agree to furnish at their cost, sewer facilities to each of these 5[–]acre plots....

It is further understood and agreed that if the Sellers are unable to furnish these utilities on or before October 15, 1980 the Sellers agree to endemnify [sic] and repay this contract within six months.

The provisions of this Supplimental [sic] Agreement shall not alter or reduce in any way the conditions, terms, and provisions of the original contract.

At the time of trial, Elders had not furnished water to the property, but the court found that they were "ready, willing, and able at all times" to supply the required water. Bells, however, had not obtained, or applied for, a building permit, and had not paid the $1,000 hook-up and installation fee. The trial court found that the Bells had "decided not to build on the [property] because they were going to live elsewhere."

The Bells sued to rescind the contract and recover the amounts they had paid thereunder, arguing in essence that the Elders had breached it by failing to supply culinary water to the property as the contract required. However, the trial court saw no purpose in requiring installation of culinary water facilities to serve rather remote property not intended for residential use, and held that the Elders were required by the contract to be merely able to furnish water to the subject property by October 15, 1980, and that they were required to actually furnish the water to the property only if the Bells had obtained a building permit and were about to construct a house, so that the water would be put to "beneficial use."[3] The Bells appeal, challenging the findings (1) that the Elders were able to supply culinary water and (2) that the culinary water would have no val-

---

**2.** The Bells and the Waldrons (who were Mrs. Bell's parents) had voluntarily partitioned the property between themselves shortly after signing the original contract.

**3.** Testimony was adduced at trial to the effect that the Bells were aware that the Elders' water rights consisted of a new appropriation, which

would would be lost if not timely put to beneficial use. Culinary use would suffice to retain the appropriation, and the Elders demonstrated both their ability to provide water and their right to do so in supplying water to a nearby household.

ue until the defendants would be able to use it.[4] Bells also argue that residential use of the property was not a condition precedent to the Elders' obligation to furnish culinary water.

■ Turning first to the Bells' challenge to the trial court's finding that the Elders were able to perform, we note at the outset the applicable standard of review: We reverse a finding of fact resulting from a trial to the bench only if, after the appellant has marshaled all available and relevant evidence, the finding appears to be clearly erroneous.[5] The Bells cite selectively to the record in support of their arguments against this finding, but have failed to thoroughly marshal all evidence relevant to the facts in question. Moreover, our review of the record indicates that there is substantial, albeit somewhat conflicting, evidence to support the challenged finding. In such circumstances, mindful of the trial court's advantaged position in hearing the testimony first hand,[6] we are not convinced that a mistake has been made.

■ As noted above, the trial court interpreted the contract as requiring that the Elders merely be able to furnish water to the subject property by October 15, 1980, and not that water actually be furnished, observing that there was as yet no house on the property, nor was construction of a house imminent. In thus interpreting the contract as requiring only that the Elders be able to furnish water by October 15, 1980, the trial court relied extensively on parol evidence to augment the tersely worded operative provisions of the written contract.[7] The propriety of admitting parol evidence to facilitate the contract's interpretation has not been challenged. Accordingly, the court's interpretation is reviewed on appeal under the standard applied to findings of fact.[8] That standard, as noted above, permits us to reverse only if the appellant marshals all evidence relevant to the finding in question and thereby shows it to be clearly erroneous. The Bells have failed both to thoroughly marshall the evidence and to demonstrate that the trial court's fact-based interpretation of this term of the contract is clearly erroneous. We therefore affirm the holding that the Elders were contractually required to be able to furnish culinary water to the property by October 15, 1980. Since they were thus able at all material times, it follows that the Elders did not breach their obligation to be able to furnish water.

We recognize that interpreting the contract to require that the Elders merely be able to furnish water falls short of requiring them to actually furnish water, and that the Bells did not contract only for the Elders' mere, inchoate ability to furnish water. Both the original agreement and the supplemental agreement contain express promises by the Elders to actually supply water to the Bells. However, although the contract contains a promise by the Elders to supply water, as well as a related promise by the Bells to obtain a building permit for the construction of a house to receive the water, no time is speci-

4. Since we hold that there was no breach by the Elders in this case because the Bells failed to tender performance of their concurrent obligations, the question of the value of the Elder's performance is immaterial, and we therefore do not consider it.

5. Utah R.Civ.P. 52(a); *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989); *State v. Walker,* 743 P.2d 191, 193 (Utah 1987).

6. *Slusher v. Ospital,* 777 P.2d 437 (Utah 1989); *IFG Leasing Co. v. Gordon,* 776 P.2d 607, 617 (Utah 1989).

7. It is, however, certainly not insignificant that the written "Supplemental Agreement" expressly requires repayment "if the Sellers are unable to furnish these utilities on or before October 15, 1980." Perhaps it could have been argued, in light of this provision, that parol evidence on this question was not necessary, with the result that we would review this question without the special deference accorded the trial court when acting as a finder of fact. However, neither party has questioned the use of parol evidence in this case.

8. *Kimball v. Campbell,* 699 P.2d 714, 716 (Utah 1985); *Allstate Enters., Inc. v. Heriford,* 772 P.2d 466 (Utah App.1989); *Crowther v. Carter,* 767 P.2d 129, 131 (Utah App.1989).

fied for performing either promise.[9] The sequence in which those promises were to be performed is nevertheless the very essence of the present controversy. The situation at trial consisted of the Bells, on the one hand, seeking to rescind the contract on the grounds that the Elders had breached an obligation to actually furnish water to the property, and, on the other hand, the Elders insisting that they would supply the required water when the Bells demanded it and performed their obligations. The question thus presented boils down to the order in which these parties must perform their related obligations.

In determining the order of performance of exchanged promises,[10] we look first to the contract itself, and, if no order of performance is therein specified, we apply the common law of constructive contractual conditions.[11] This contract is silent on the time or times for actually furnishing water and for obtaining a building permit.[12] In such a case, where there is no express indication of the intended order for performance, the law implies a covenant and condition that the related obligations be performed concurrently.[13]

Since performance of these obligations was due concurrently, neither party could claim a breach by the other until the party claiming the breach tendered performance of its concurrent obligation. The rule requiring such a tender has been explained in a case in which a real estate purchaser and seller each demanded and awaited performance by the other of their respective obligations to pay the price and deliver the property. The Supreme Court's words in that case apply here as well:

> This is precisely the sort of deadlock meant to be resolved by the requirement of tender.
>
> .... During the executory period of a contract whose time of performance is uncertain but which contemplates simultaneous performance by both parties, ... neither party can be said to be in default ... until the other party has tendered his own performance. In other words, the party who desires to use legal process to exercise his legal remedies under such a contract must make a tender of his own agreed performance in order to put the other party in default.[14]

This case demonstrates that the rule requiring tender before claiming breach of a concurrent promise is not a mere formality

---

**9.** The original agreement required the Elders to furnish water by July 1978. When, however, they failed to do so, the "Supplimental Agreement" extended the time for their performance, but without specifying another exact date.

**10.** By "exchanged promises," we mean that the promises are interrelated to the extent that they comprise a single exchange. *See* Restatement (Second) of Contracts § 232 (1982).

**11.** *See generally* J. Calimari & J. Perillo, *Contracts* § 11–21 (2d ed. 1977).

**12.** There was, however, parol evidence indicating that both installation and use of the water could not be deferred indefinitely. The parties knew that the water for the property would be obtained from a new appropriation through the State Engineer's office, and that the water would therefore have to be put to a beneficial use in order for its appropriation to continue. The water rights by which water was to have been brought to the land would therefore apparently have been lost, if Bells had not promptly put the water to beneficial use. The trial court did not, however, hold that the need for prompt beneficial use was sufficient to support implication of a contract term prescribing the order of performance, but rather found that "[t]here is nothing in the contract ... which requires ... a water hook-up at the property line by a certain date."

Although the contract thus does not specify a precise deadline, performance was nevertheless due within a reasonable time. *Bradford v. Alvey & Sons*, 621 P.2d 1240, 1242 (Utah 1980); *Cooper v. Deseret Fed. Sav. & Loan Ass'n*, 757 P.2d 483, 485 (Utah App.1988). If neither party performed its exchanged promise within that time, both promises are discharged. 6 A. Corbin, *Corbin on Contracts* § 1258 (1960). Neither of these parties argues that the time for performance exceeds a reasonable time.

**13.** Restatement (Second) of Contracts § 234; 3A A. Corbin, *Corbin on Contracts* 656 at 145–47 (1960); *see also Rubin v. Fuchs*, 1 Cal.3d 50, 459 P.2d 925, 81 Cal.Rptr. 373 (1969).

**14.** *Century 21 All Western Real Estate and Inv. Inc. v. Webb*, 645 P.2d 52, 55–56 (Utah 1982) (citations omitted); *Carr v. Enoch Smith Co.*, 781 P.2d 1292, (Utah App.1989); *see also Zion's Properties, Inc. v. Holt*, 538 P.2d 1319 (Utah 1975); *Fischer v. Johnson*, 525 P.2d 45 (Utah 1974).

or trap for the unwary. Here, the claimant's tender would demonstrate the continued practical vitality and purposefulness of the promise owed the claimant. Public policy and common sense oppose the waste of installing a culinary water line to serve land which, for all that appears, will remain unused. The rule requiring tender thus serves, among other purposes,[15] to prevent a claimant from insisting upon a purposeless performance, or from avoiding his own obligations on pretext.[16]

Inasmuch as the material findings do not appear to be clearly erroneous and the failure of the plaintiffs to perform their own obligations precludes recovery on their claims, the judgment is affirmed.

JACKSON and ORME, JJ., concur.

---

**15.** This court recently observed that another purpose served by the tender requirement is the avoidance of speculation and guesswork about how the other party would perform when put in the position of choosing to perform or risking a default. *Carr v. Enoch Smith Co.*, 781 P.2d 1292, 1295 (Utah App.1989).

**16.** *See, e.g., Huck v. Hayes,* 560 P.2d 1124, 1126 (Utah 1977).