**Jerald G. SEARE, Plaintiff and Appellant,**

v.

**UNIVERSITY OF UTAH SCHOOL OF MEDICINE, Department of Surgery, an entity of the State of Utah; William A. Gay, Jr.; James M. McGreevy; and John Does I through X, Defendants and Appellees.**

No. 930326–CA.

Court of Appeals of Utah.

Sept. 15, 1994.

Rehearing Denied Oct. 11, 1994.

---

**12.** See Richards v. Leavitt, 716 P.2d 276, 277 (Utah 1985) (per curiam); Sears v. Southworth, 563 P.2d 192, 194 (Utah 1977).

L. Zane Gill, Salt Lake City, for appellant.

Jan Graham and Brent A. Burnett, Salt Lake City, for appellees.

Before DAVIS, GREENWOOD, and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Appellant Jerald G. Seare (Seare) appeals the trial court's grant of summary judgment in favor of appellees, University of Utah School of Medicine, et al. (University). Seare sued the University claiming it had failed to perform its responsibilities in regard to his medical resident training program at the University of Utah. Seare argues on appeal that the trial court erred because there are genuine issues of material fact relating to the University's alleged breach of contract, breach of implied covenants, and Seare's federal civil rights claims which preclude summary judgment. We affirm.

## STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c). A review of the trial court's order of summary judgment presents questions of law. Thus, we accord no deference to the trial court's determination and review it for correctness. *Pratt v. Mitchell Hollow Irrigation Co.*, 813 P.2d 1169, 1171 (Utah 1991); *Mumford v. ITT Commercial Fin. Corp.*, 858 P.2d 1041, 1043 (Utah App.1993). Further, we review the evidence "in the light most favorable to the losing party, and affirm only where it appears there is no genuine dispute as to any material issues of fact." *Themy v. Seagull Enters., Inc.*, 595 P.2d 526, 528–29 (Utah 1979) (footnote omitted).

## BACKGROUND

In 1983, one year prior to Seare's graduation from medical school, Dr. Clifford Snyder, the University's Chief of Plastic Surgery, encouraged Seare to participate in a

new plastic surgery residency program. The program consisted of a three-year general surgery residency followed by a three-year plastic surgery residency (the 3 + 3 program). The program's goal was to train medical students as specialists in the field of plastic surgery. As with all medical residency programs, the 3 + 3 program had to be approved by various university and national organizations and committees. Sometime later in 1983, Dr. Snyder informed Seare that the 3 + 3 program had been approved and formally accepted him into the program. In 1984, Seare began his first year of the 3 + 3 program. Seare and the University executed a standardized Houseofficer contract [1] for the first year general surgery residency, as well as for all subsequent residency years. On November 12, 1986, Dr. Louis Morales [2] sent Seare a letter accepting him into the three-year plastic surgery portion of the 3 + 3 program. However, on January 9, 1987, Dr. William Gay, Chair of the Department of Surgery, sent Seare a letter informing him that the 3 + 3 program had been discontinued. The letter stated that the 3 + 3 program had never been approved by the University's Graduate Medical Education Committee and that a full five year general surgery residency would be a prerequisite to entrance into the University's two-year plastic surgery residency (the 5 + 2 program). Further, the letter stated that no plastic surgery residencies would be granted for the following year.

On March 17, 1987 Seare and the University executed, after negotiations, a Houseofficer contract securing Seare a position as a fourth-year general surgery resident. During his fourth year, Seare requested, and was granted, a fifth year of residency in general surgery. Later, on June 8, 1988, Seare executed a Houseofficer contract with the University for this fifth year of general surgery residency.

Near the end of his fifth year, Seare was accepted as the first alternate in the University's two-year plastic surgery residency program. Seare then decided to enter the practice of general surgery instead of reapplying for a plastic surgery residency at the University or at a different school. However, before Seare could practice as a general surgeon, the University had to certify him to sit for the general surgery board examination (the board exam) administered by the American Board of Surgery.

Although the University was prepared to certify Seare to sit for the board exam to allow him to enter into a plastic surgery residency, it refused to certify him to sit for the board exam given his stated intention to practice medicine as a general surgeon. The University argues that Seare was not qualified to practice general surgery because he did not have the necessary experience as a surgical chief resident as corroborated by the reviews of several physicians with whom Seare had worked.

Seare, on the other hand, believed that upon completion of five years of general surgery residency he would be eligible to sit for the board exam regardless of his intent to either enter the plastic surgery program or practice as a general surgeon. According to Seare, his fifth year of general surgery residency was no different from other fifth-year residents except that he was assigned to a private hospital. Seare claims that Dr. McGreevy, Director of General Surgery for the Department of Surgery, told Seare that he was expected to act as a chief resident in all respects. Seare claims that his fifth year duties at LDS Hospital in Salt Lake City were essentially the same as other general surgery chief residents at the University of Utah and Veterans Administration hospitals.

In contrast, Dr. McGreevy testified that he structured Seare's fifth year with the understanding that Seare would pursue an additional residency in plastic surgery. For this reason, Dr. McGreevy claims to have informed Seare that he could not offer Seare a chief year in general surgery and that his fifth year was in fact different than the fifth year for other general surgery residents.

---

1. This standardized employment contract sets forth the student's responsibilities and also includes various housekeeping items such as salary and medical and malpractice insurance.

2. Dr. Morales was appointed as acting Chief of Plastic Surgery after Dr. Snyder retired.

On September 25, 1989, Seare filed suit against the University for breach of contract, breach of implied covenants, and violation of his civil rights under 42 U.S.C. § 1983.[3] Seare also sought a writ of mandamus under his contract theory. On December 4, 1992, the University moved for, and the trial court later granted, summary judgment. The trial court's ruling included the following conclusions: (1) any contract between Seare and the University regarding the 3 + 3 program had been modified by execution of the 1987 Houseofficer contract; (2) the University impliedly covenanted to certify Seare to sit for the board exam on condition that he pursue additional plastic surgery training and Seare failed to pursue additional training thus negating the implied covenant; (3) the defendants were not "persons" who could be sued under 42 U.S.C. § 1983; and (4) Seare had not presented any protectable liberty or property interest to support an action under section 1983.

On appeal, Seare argues that genuine issues of material fact exist regarding the nature and breach of his contract with the University, the nature and breach of the University's implied covenants of good faith and fair dealing, and the issues relating to his section 1983 claim. We will address each contention separately.

**3.** Although Seare also sued the University for intentional or negligent infliction of emotional distress, misrepresentation and deceit, he later acquiesced in the trial court's dismissal of these claims.

**4.** Preliminarily, we address the trial court's consideration of disputed and undisputed facts. The University asserts there are no disputed material facts because Seare failed to support the facts recited in his memorandum opposing summary judgment. The University notes that although Seare refers to numerous depositions, letters, and contracts in his memorandum, such documents, with the exception of one contract, were never part of the record and should not be considered on appeal. Furthermore, the University states that the facts set forth in its memorandum supporting summary judgment are undisputed and properly before this court because they are supported by affidavits, depositions, and other documents included in the trial court record and the record on appeal.

The University's statement of the law is correct. As the Utah Supreme Court has stated, in reviewing an order granting summary judgement "[w]e consider only the pleadings, depositions, admissions, answers to interrogatories, and affi-

## ANALYSIS

### The 3 + 3 Program

Seare's complaint alleged that the University breached its contract with him to provide training through the 3 + 3 program. On appeal, he asserts that issues regarding the parties' intent, meeting of the minds, and breach of the arrangement, present material issues of fact that preclude summary judgment.[4] Regardless of the nature of the 3 + 3 program, we agree with the trial court that it was abrogated by the parties' subsequent action. Seare and the University executed a Houseofficer contract for a fourth year of general surgery residency after Seare received Dr. Gay's letter informing him that the University was discontinuing the 3 + 3 program. The University's intent at this point was indisputedly to provide Seare additional experience to prepare him for a plastic surgery residency and Seare acquiesced by entering the fourth year of general surgery residency. Thus, by executing the Houseofficer contract, the parties modified the original 3 + 3 program. Seare's claim for breach of contract is limited therefore to the modified 5 + 2 program and his fifth-year Houseofficer contract.[5]

davits properly before the trial judge." *Pratt v. Mitchell Hollow Irrigation Co.*, 813 P.2d 1169, 1171 & n. 1 (Utah 1991); *accord Alford v. Utah League of Cities and Towns*, 791 P.2d 201, 206 n. 3 (Utah App.1990) ("In resolving an appeal, an appellate court may not consider depositions which have not been filed with the district court").

However, notwithstanding Seare's failure to support his asserted facts with appended documents, the trial court's order granting summary judgment states that "[f]or purposes of this Motion, the Court accepted as true all facts provided by Plaintiff in his Memorandum in Opposition to Defendant's Motion for Summary Judgement." Because summary judgement is a harsh remedy, and because the trial court's order, drafted by the University, accepted Seare's asserted facts as true, we also accept the facts set forth in Seare's memorandum and will note any disputed, relevant factual allegations.

**5.** Seare concedes that entry into the final two-year plastic surgery residency of the 5 + 2 program was contingent upon the University accepting him and thus he does not seek relief regarding that portion of the arrangement.

### Breach of Contract

Seare asserts that the Houseofficer contracts obligated the University to certify him for the board exam after he completed five years of general surgery residency. Seare relies on the express term of the Houseofficer contract which states that the University agrees to "provide an appropriate certificate upon satisfactory completion of the education and training program."

In interpreting a contract, "'we first look to the four corners of the document to determine the intent of the parties.'" *Wade v. Stangl*, 869 P.2d 9, 12 (Utah App. 1994) (quoting *Anesthesiologists Assoc. v. St. Benedict's Hosp.*, 852 P.2d 1030, 1035 (Utah App.1993)). A contract "'may be ambiguous if it is unclear, omits terms, or if the terms used to express the intention of the parties may be understood to have two or more plausible meanings.'" *Wade*, 869 P.2d at 12 (quoting *Village Inn Apartments v. State Farm Fire and Casualty Co.*, 790 P.2d 581, 583 (Utah App.1990)). If a contract is ambiguous, courts may look to extrinsic evidence to clarify the parties' intent. *West Valley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1313 (Utah App.1991).

The contract language Seare relies upon does not clearly identify what an "appropriate certificate" is, nor does it define what constitutes "satisfactory completion of the education and training program." We conclude that this language is ambiguous and therefore look to other language in the contract to determine the intent of the parties.

The contract submitted to the court indicates the existence of two types of relationships between the University and Seare. First, the Houseofficer contract, by delineating Seare's salary, insurance, paid vacation, and other employee benefits, indicates an employment relationship. Second, the contract and other evidence submitted by the University reveals a teacher/student relationship whereby the University agreed to provide Seare with education and training. The contract provides that the University would offer an "educational and training program that meets the standards of 'Essentials of Approved Residencies.'" Although this additional contract language is helpful in defining the general relationship between Seare and the University, it is of little help in our analysis of the University's specific obligations under the contract.

Because the contract is ambiguous, we further determine the University's obligations by looking to extrinsic evidence submitted to the trial court. Dr. McGreevy testified that Seare was never formally accepted into the University's five-year general surgery residency program. Instead, Dr. McGreevy states that Seare was only allowed to enter a fourth and fifth year of general surgery residency as a prelude to his pursuit of a plastic surgery residency. Further, Dr. McGreevy stated that he designed Seare's fifth year anticipating further plastic surgery training and that Seare's fifth year was not the equivalent of other fifth-year general surgery residents because he did not have experience as a chief resident nor the range of experience in surgical procedures necessary to practice as a general surgeon. It is undisputed that Seare was never afforded the official title of chief resident and did not experience rotations among the various hospitals as did other fifth year residents.[6] Finally, Dr. McGreevy stated that letters provided by physicians who worked with Seare supported Dr. McGreevy's conclusion that Seare was not then qualified to practice as a general surgeon.

Seare states that Dr. McGreevy told him that his fifth year of general surgery residency would be equivalent to a chief resident year. He further contends that in his opinion, his fifth year was essentially equivalent to that of other fifth year residents. Seare argues that he expected and believed that his five years of general surgery residency qualified him to sit for the board exam. Thus, he believed he could change his mind during his

---

6. The standard fifth year residency required chief residents to spend various amounts of time in residency at the University of Utah, Veteran's Administration, and L.D.S. hospitals. Seare was informed before his fifth year that he would spend his entire year at L.D.S. Hospital and would not be participating in the rotations at University of Utah and Veteran's Administration hospitals.

fifth year and enter general surgery practice instead of pursuing a plastic surgery residency. However, there is nothing in the record that substantiates this expectation. The evidence underscores the University's expectation that Seare would pursue additional training in plastic surgery. There is no evidence that Seare ever mentioned to anyone involved with the University that he might forego the plastic surgery residency and practice general surgery instead until late in his fifth year as a resident. In fact, Seare admits that until that time he intended to pursue training to qualify as a plastic surgeon. Further, there is no evidence substantiating Seare's expectation that completion of his fifth year would lead to an automatic certification by the University to sit for the board exam. Seare's unsubstantiated expectation is not enough to establish a meeting of the minds that in turn created an enforceable contract obligating the University to certify him. *See Commercial Union Assoc. v. Clayton,* 863 P.2d 29, 37 (Utah App.1993) (stating that before enforcement of contract, meeting of minds must occur which must be spelled out with sufficient definiteness).

In examining the undisputed facts in this case, it appears that at the time Seare and the University entered into the fifth year houseofficer contract, the University granted Seare a tailor-made fifth year of general surgery residency based on the anticipation shared by both parties that Seare would pursue additional training in plastic surgery at the end of his fifth year. As a result, Seare's fifth year of residency differed from that of other fifth year residents in that he did not experience rotations at the University of Utah and Veteran's Administration hospitals. However, at the end of his fifth year, Seare changed his mind and decided instead to immediately enter the practice of general surgery. It is undisputed that Dr. McGreevy applies a different standard when certifying those continuing their education and training and those proceeding directly into general surgery practice. When Dr. McGreevy learned of Seare's decision not to pursue additional training, he justifiably applied the heightened standard and refused to certify Seare based on the mixed reviews Seare received from the doctors he had worked with and on the fact that Seare had not experienced the same fifth year as other fifth year residents. Given the tailor-made nature of Seare's training, the University was apparently only obligated to certify Seare for additional training in a plastic surgery residency if he satisfactorily completed the five-year resident program designed specifically for that purpose. When the University learned of Seare's decision not to pursue an additional plastic surgery residency, it was no longer obligated to certify him. Further, the evidence justifies the University's refusal to certify Seare to sit for the board exam so that he could practice general surgery. The University was clearly entitled to assess in good faith whether Seare had satisfactorily completed the necessary training so the University could certify him as competent to practice general surgery. We therefore conclude that the University did not breach any express terms of its contract with Seare.

### Implied Covenant of Good Faith and Fair Dealing

Seare asserts that the University breached an implied covenant of good faith and fair dealing by refusing to certify him to take the board exam at the completion of his fifth year of residency. We disagree.

■ Although contracts are subject to implied covenants of good faith, such covenants " 'cannot be construed … to establish new, independent rights or duties not agreed upon by the parties.' " *Sanderson v. First Sec. Leasing Co.,* 844 P.2d 303, 308 (Utah 1992) (quoting *Brehany v. Nordstrom, Inc.,* 812 P.2d 49, 55 (Utah 1991)). Thus, these covenants are implied in contracts "to protect the express covenants or promises of the contract…." *Peterson v. Browning,* 832 P.2d 1280, 1284 (Utah 1992) (quoting *Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 232, 765 P.2d 373, 394 (1988)).

■ As discussed above, the University's obligation under the contracts was to provide Seare the experience and training necessary to pursue a plastic surgery residency. There were no express covenants or promises to train Seare to become a general surgeon or to automatically certify him to sit for the

board exam. Therefore, there could be no implied covenants or promises to do the same. The University provided Seare with training to prepare him to enter a plastic surgery residency. The University refused to certify Seare to sit for the exam only when it learned of his intention not to pursue additional training. Thus, the University acted in good faith regarding its express promises under the contracts. Therefore, we agree with the trial court that as a matter of law, the University did not breach any implied covenant of good faith and fair dealing.

## Section 1983 Claims

█ Finally, Seare contends that the trial court erred in concluding that the University and its agents were not "persons" who could be sued under 42 U.S.C. § 1983 for civil rights violations.[7]

The United States Supreme Court in *Will v. Michigan Department of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), held that states cannot be sued in their own courts for civil rights violations under section 1983. In *Will*, the Court held that the state of Michigan and its police department could not be sued in a Michigan state court for civil rights violations. *Id.* at 71, 109 S.Ct. at 2312. The Court stated that "[i]t is an 'established principle of jurisprudence' that the sovereign cannot be sued in its own courts without its consent. We cannot conclude that § 1983 was intended to disregard the well established immunity of a State from being sued without its consent." *Id.* at 67, 109 S.Ct. at 2310 (quoting *Beers v. Arkansas*, 61 U.S. (20 How.) 527, 529, 15 L.Ed. 991 (1858)). Further, the Court held that state officials acting in their official capacity are not "persons" who may be sued under section 1983. *Will*, 491 U.S. at 71, 109 S.Ct. at 2312 ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983").

█ In the instant case, Seare is suing the University of Utah School of Medicine and a number of its employees. Under Utah law, the University and its School of Medicine are state institutions. *See* Utah Code Ann. § 53B-1-102 (1994). Additionally, the state has expressly declared that it maintains its immunity from civil rights claims. Utah Code Ann. § 63-30-10(2) (Supp.1993). Thus, the trial court was correct in ruling that the University of Utah School of Medicine cannot be sued under 42 U.S.C. § 1983 and that its employees acting in their official capacity, as is the case here, are not "persons" who can be sued under section 1983.[8]

## CONCLUSION

Based upon our review of the record, we find that the trial court did not err as a matter of law in summarily dismissing Seare's breach of contract, breach of implied covenants and section 1983 claims. Therefore, we affirm the trial court's order granting summary judgment in favor of the University.

DAVIS, J., concurs.

JACKSON, J., concurs in result.

---

7. Seare also asserts that the trial court erred by summarily ruling that he did not establish any protectable liberty or property interest under § 1983. Since we hold that the University is not a "person" who may be sued under § 1983, we need not reach this claim.

8. Seare further argues that the individual defendants are "persons" under § 1983 which may be sued for "prospective" relief. Seare is correct that the individual defendants may be sued for "prospective" relief under § 1983. However, Seare has sought only monetary "damages" under his § 1983 claim and not "prospective" relief.