**PDQ LUBE CENTER, INC., a Utah corporation, Plaintiff and Appellee,**

v.

**R. Lowell HUBER, Defendant, Third-party Plaintiff, and Appellant,**

v.

**June T. BOWEN, Estate of Darold J. Bowen, Dennis Greene, Pete Riggs, Bob Riggs, Reed Hooley, Troy Hooley, and John and Jane Does 1–10, Third-party Defendants.**

**PDQ LUBE CENTER, INC., a Utah corporation, Plaintiff and Appellant,**

v.

**R. Lowell HUBER, Defendant and Appellee.**

**Nos. 950752–CA, 960617–CA.**

Court of Appeals of Utah.

Dec. 4, 1997.

---

Joseph M. Chambers, Logan, for R. Lowell Huber.

Larry E. Jones, Logan, for PDQ Lube Center, Inc.

Before DAVIS, P.J., WILKINS, Associate P.J., and JACKSON, J.

## AMENDED OPINION [1]

JACKSON, Judge:

R. Lowell Huber appeals the findings of fact and conclusions of law and judgment entered by the trial court on July 3, 1995, determining that Huber failed to perform his obligations under a real estate agreement in good faith. PDQ Lube Services Center, Inc. (PDQ) appeals the trial court's later order terminating Huber's obligation to convey the property. This order was entered after the trial court ruled that PDQ had failed to timely tender its payment pursuant to the July 3, 1995 judgment. The two appeals have been consolidated for purposes of entering our opinion.

## BACKGROUND

On September 17, 1993, PDQ made an offer, on a standard Real Estate Purchase Contract form, to buy Huber's property located on North Main Street in Logan, Utah for $125,000. Huber accepted PDQ's offer with additional negotiated terms on September 22, 1993. In relevant part the contract provided:

2.1 Existing/New Loan Application. Buyer [PDQ] agrees to make application

---

1. This Amended Opinion replaces the Opinion in Cases No. 950752–CA and 960617–CA issued on November 6, 1997.

for a loan specified above[2] within 5 calendar days (Application Date) after Acceptance. Buyer will have made Loan Application only when Buyer has: (a) completed, signed, and delivered to the Lender the initial loan application and documentation required by the Lender; and (b) paid all loan application fees as required by the Lender. Buyer will continue to provide the Lender with any additional documentation as required by the Lender. If, within seven calendar days after receipt of written request from Seller [Huber], Buyer fails to provide to Seller written evidence that Buyer has made Loan Application by the Application Date, then Seller may, prior to the Qualification Date below, cancel this Contract by providing written notice to Buyer....

2.2 Qualification. Buyer and the Property must qualify for a loan for which application has been made under Section 2.1 within 60 calendar days (Qualification Date) after Acceptance. The Property is deemed qualified if, on or before the Qualification Date, the Property, in its current condition and for the Buyer's intended use, has appraised at a value not less than the Total Purchase Price. Buyer is deemed qualified if, on or before the Qualification Date, the Lender verifies in writing that Buyer has been approved as of the verification date.

2.3 Qualification Contingency. If Seller has not previously voided this Contract as provided in Section 2.1, and either the Property or Buyer has failed to qualify on or before the Qualification Date, either party may cancel this Contract by providing written notice to the other party within three calendar days after the Qualification Date, otherwise Buyer and the Property are deemed qualified....

3. CLOSING. This transaction shall be closed on or before Dec. 15, 1993. Closing shall occur when: (a) Buyer and Seller have signed and delivered to each other (or to the escrow/title company), all documents required by this Contract, by the Lender, by written escrow instructions and by applicable law; and (b) the monies required to be paid under these documents, have been delivered to the escrow/title company in the form of cashier's check, collected or cleared funds....

. . . .

9. SPECIAL CONTINGENCIES. This offer is made subject to: A.) Buyer obtaining new financing. The terms of attached Addendum # 1 are incorporated into this Contract by this reference....

Because the property had previously been the site of a gas station and still had storage tanks underground, both parties were concerned about the affect these tanks would have on the deal. Consequently, they included a handwritten addendum, Addendum # 1, which provided:

The following terms are hereby incorporated as part of THE AGREEMENT:

(1) Seller will provide State of Utah/Bear River Health Department environmental clearance and remove any unacceptable contamination at Seller[']s expense. (2) Buyer to provide a $4,000 non-refundable cleanup deposit, forfeited if Buyer does not complete transaction, credited to reduce purchase price upon completing transaction. (3) Buyer is responsible for all demoli[t]ion and removal and dump fees. (4) Seller retains first right to match lowest demolition bid and complete bid project within 30 days after closing, weather permitting reasonable delays. (5) Seller to remove all fuel and oil storage tanks. (6) Seller to retain all salvage rights. (7) Offer subject to approval of Logan City as to building, site and construction permits. (8) Site subject [to] approval of Pen[n]zoil Products within 30 days after acceptance. (9) Buyer agrees to facilitate Seller[']s 1031 Exchange. (10) Seller to fill all holes caused by removal of tanks with fill material.

The contract also contained an integration clause and specified that time was of the essence.

---

2. Section 2 of the Real Estate Purchase Contract specified that PDQ would pay a $1,000 earnest money deposit, $92,750 in proceeds from a new Small Business Association (SBA) loan, and $31,250 cash at closing for a total of $125,000.

Within a week, PDQ sought financing to develop the site. It contacted the Certified Development Company in Salt Lake City and eventually met with Joel Rush, a banker with the Bank of Utah,[3] to begin the SBA application process. Over a period of four weeks, PDQ supplemented its application with various materials requested by Rush, including demographic data, building plans, ten-year projections, balance sheets, tax returns, and financial statements. PDQ obtained site approval from Pennzoil Products, and although a building permit was not formally approved, also met with Logan City personnel concerning its plans to build on the property.

Huber was licensed and worked as an underground storage tank remover. At the time of this deal, he had permits to remove the underground tanks from the property. Although Huber represented that he could remove the tanks within thirty days of the signing of the contract, he failed to do so. Huber testified that he did not remove the tanks because he had not received the $4,000 cleanup deposit from PDQ.[4] However, the trial court found that Huber had received the cleanup deposit, and, further, that Huber had "failed to make a good faith effort to remove the tanks" and had "engaged in bad faith conduct in an attempt to kill the deal" because he did not receive anticipated funding from the property's previous owners to assist in the tank removal.[5] The trial court also found that as a consequence of Huber's bad faith conduct, PDQ was prevented from formally applying for a loan and obtaining an appraisal of the property because PDQ's banker believed that an appraisal and loan application would be futile until the site was cleaned and inspected.

Having entered the findings of fact and conclusions of law based on its analysis, the trial court ordered specific performance, re-quiring that Huber comply with the contract by "providing [PDQ] with a state and local environment clearance certificate for the site." The court further ordered Huber "to convey the property to [PDQ] if [PDQ] is able to tender the full purchase price within 84 days following the proof to [PDQ] of environmental clearance for the site." Finally, the court ordered both parties to comply with the terms of the contract. Huber appeals from these findings of fact, conclusions of law, and judgment entered July 3, 1995.

On September 7, 1995, PDQ received a letter from the Utah Department of Environmental Quality stating that the requirements of environmental cleanup had been satisfied. On November 28, 1995, two days before the court-ordered eighty-four-day period had expired, PDQ delivered a "letter of tender" to Huber indicating that the "$1,000 Earnest Money Deposit [was] in the Coldwell Banker account" and that "[t]he remaining $124,000 [was] being delivered" to the title company. Upon Huber's demand for payment at 6:00 p.m. on the same day, however, the title company denied payment because it indicated that it had not yet received the funds. At that time the title company had received only $39,000. Primarily because the full amount had not been delivered to the title company, Huber immediately rejected PDQ's "letter of tender" as a written tender of performance under Utah Code Ann. §§ 78–27–1 and 78–27–3 (1996).

Later that evening the title company received the balance of the funds, which included a cashier's check from Guardian State Bank for $84,150. Negotiation of the cashier's check was conditioned upon PDQ providing "[e]vidence of proper registration with the State of Utah of both P.D.Q. Lube Center of Logan, L.L.C. and PDQ Lube Center, Inc." Although Guardian State Bank appar-

---

**3.** Rush later became associated with Guardian State Bank, the bank that ultimately approved the loan to PDQ after the trial court entered its judgment.

**4.** Huber's brief repeatedly makes the claim that Huber testified that he did not remove the tanks because he knew that PDQ had not received financing. The transcript reveals however that Huber never testified that his reason for delaying removal was because PDQ had not obtained fi-nancing. The only reason he cited for his delay was that he had not received the $4,000 cleanup deposit.

**5.** The previous owners are the defendants in a third-party action arising from this case. Because the facts are not relevant to a determination of the issues on this appeal, they are not discussed here.

ently orally authorized the removal of the condition on December 4, 1995, the condition was never formally removed or satisfied until December 21, 1995.

On December 12, 1995, Huber filed a motion for an order to terminate the contract and on December 14, 1995, PDQ filed a motion to compel compliance with the contract terms. After a hearing on the motions, the trial court issued a memorandum decision ruling that PDQ had "failed to make a proper tender of payment" and granting Huber's motion and denying PDQ's motion. In response, PDQ filed a motion for a new trial or amendment of judgment and requested an evidentiary hearing to take additional testimony. The trial court issued a second memorandum decision reiterating that PDQ had failed to make a proper tender and denied PDQ's motions. PDQ appeals from this order.

## ANALYSIS

### I. Huber's Appeal

Huber appeals from the July 3, 1995 judgment. The primary issues he raises are (1) whether the trial court erred in concluding that Huber had engaged in bad faith conduct,

and (2) whether the trial court erred in granting specific performance.[6] "We review the trial court's conclusions of law for correctness, granting them no deference." *Jouflas v. Fox Television Stations*, 927 P.2d 170, 174 (Utah 1996).

### A. Covenant of Good Faith and Fair Dealing

Huber contends that the trial court erred when it concluded that Huber breached the constructive[7] covenant of good faith and fair dealing by failing to remove the tanks and provide environmental clearance to PDQ.

In this state, a covenant of good faith and fair dealing inheres in most, if not all, contractual relationships.... Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract. A violation of the covenant gives rise to a claim for breach of contract.

... To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed

---

**6.** Huber stated six issues for review. We address only the issues as outlined in the text of the opinion.

Issue 1, which asserts that the trial court held that Huber's performance was a condition precedent to PDQ's performance, totally misstates the conclusions of the trial court. The trial court concluded that "Huber failed to make a good faith effort to remove the tanks" and "engaged in bad faith conduct in an attempt to kill the deal." It further concluded that "PDQ ... made all reasonable efforts to comply in good faith with its obligations under the contract," and "any failure of PDQ ... to perform under the contract was directly related to or caused by ... Huber's bad faith and failure to perform." As is apparent, the court found only that Huber breached his covenant of good faith and fair dealing, which prevented PDQ from performing under the terms of the contract. The court never concluded that Huber's performance was a condition precedent to PDQ's performance.

Huber mentions issues 1B and 4 in the issues-for-review section of the brief, but fails to argue them. As for issue 5, Huber merely cites the statute that he contends the court misconstrues but never makes any legal or factual argument that the court erred in applying it, other than the conclusory statement that "the trial court erred

as a matter of law." Rule 24(a)(9) of the Utah Rules of Appellate Procedure provides: "The argument shall contain the contentions and reasons of the appellant with respect to the issues presented ... with citations to the authorities, statutes, and parts of the record relied on." Because "an appellate court is not ' "a depository in which the appealing party may dump the burden of argument and research," ' " we decline to consider any argument not specifically argued in Huber's brief. *State v. Vigil*, 922 P.2d 15, 25 (Utah Ct.App.1996) (citations omitted).

**7.** Many courts have stated that a covenant of good faith is "implied" in every contract, perhaps because a leading opinion, *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 188 N.E. 163, 167 (1933), used that language. "While it is true that courts impose an obligation of good faith in every aspect of the contractual relationship ... the obligation of good faith is 'constructive' rather than 'implied' " because the obligation is imposed by law and cannot be disclaimed. *Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 450 n. 4 (Utah Ct.App.1994) (quoting 3A Arthur L. Corbin, *Corbin on Contracts* § 654A(B) (2d ed.1993)) (citation omitted).

common purpose and the justified expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language *and* the course of dealings between and conduct of the parties.

*St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 199–200 (Utah 1991) (citations omitted); *see also Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991) ("[T]he parties to a contract are deemed to intend that the terms of a contract should be construed in a manner which assumes the parties intended that the duties and rights created by the contract should be performed and exercised in good faith."). This means that "one party may not render it difficult or impossible for the other to continue performance and then take advantage of the non-performance he has caused." *Zion's Properties, Inc. v. Holt*, 538 P.2d 1319, 1321 (Utah 1975); *see also Olympus Hills Shopping Ctr., Ltd. v. Smith's Food & Drug Ctrs., Inc.*, 889 P.2d 445, 450 (Utah Ct.App.1994) ("Our courts have determined that a party must exercise express rights awarded under a contract reasonably and in good faith."). "However, there is no violation of the duty of good faith, as a matter of law, when a party is simply exercising its contractual rights." *Howe v. Professional Manivest, Inc.*, 829 P.2d 160, 163 (Utah Ct.App.1992) (citing *Heiner v. S.J. Groves & Sons Co.*, 790 P.2d 107, 115 (Utah Ct.App.1990)). Further, "[s]uch a covenant cannot be construed ... to establish new, independent rights or duties not agreed upon by the parties." *Brehany*, 812 P.2d at 55; *accord Seare v. University of Utah Sch. of Med.*, 882 P.2d 673, 678 (Utah Ct.App.1994).

■ Although Huber does not dispute the existence of the covenant of good faith and fair dealing, he asserts that he has not violated it. He contends that he was merely exercising his contractual rights by "wait[ing] to see if PDQ was going to qualify for a loan" before he began removal of the tanks and that by construing the contract to require him to perform before closing, the trial court added additional terms to the contract. These arguments are untenable.

In determining the order of performance of exchanged promises, we look first to the contract itself, and, if no order of performance is therein specified, we apply the common law of constructive contractual conditions.... [W]here there is no express indication of the intended order for performance, the law implies a covenant and condition that the related obligations be performed concurrently.

*Bell v. Elder*, 782 P.2d 545, 548 (Utah Ct. App.1989) (footnotes omitted). In this case, as Huber argued in his brief,[8] the contract did not specify an order of performance and, thus, the contractual obligations are construed to include an implied covenant and condition of concurrent performance. Consequently, Huber had a duty to begin performing his contractual obligations, which included removing the storage tanks and cleaning the site, within a reasonable time. In its findings of fact, which Huber did not challenge in this appeal, the trial court found that Huber had received PDQ's cleanup deposit with sufficient time to act before closing, but Huber failed to "remove any unacceptable contamination" during the executory period of the contract and intended to "kill the deal" after the previous owners would not help finance the tank removal. Because Huber had an obligation to act in conformity with the common purpose of the contract and the parties' justified expectations, the trial court correctly concluded that Huber breached the covenant of good faith and fair dealing when he failed to even begin removing the tanks and cleaning the property within the executory period.

■ Huber further contends however that he did not breach the covenant of good faith and fair dealing since he had a contractual right to delay performance until he was assured that PDQ would receive financing. His contention is flawed. Both parties under concurrent performance obligations must perform before either can bring an action against the other. *Cf.* Restatement (Second)

---

8. Although the trial court never concluded, as argued by Huber, that Huber's performance was a condition precedent to PDQ's performance, *see*

*supra* note 6, Huber correctly argued in his brief that the contractual provisions were to be performed concurrently.

of Contracts § 234 cmt. a (1981). Thus, Huber might have had a contractual right to delay performance if PDQ had failed to perform. However, the trial court specifically found that PDQ had done everything it could to obtain financing up to that time. Huber does not challenge that finding. Accordingly, the trial court correctly concluded that Huber had no contractual right to delay performance.[9] *Cf. Olympus Hills,* 889 P.2d at 450 ("Our courts have determined that a party must exercise rights awarded under a contract reasonably and in good faith.").

## B. Specific Performance

■ Huber cites *Century 21 All Western Real Estate & Investment Inc. v. Webb,* 645 P.2d 52 (Utah 1982), and *Bell v. Elder,* 782 P.2d 545 (Utah Ct.App.1989), to support his contention that, even if he did violate the covenant of good faith and fair dealing, the trial court erred in granting specific performance to PDQ. He reasons that PDQ never tendered performance by the closing date though time was of the essence of the contract. It is generally true that "the party who desires to use legal process to exercise his legal remedies must make a tender of his own agreed performance in order to put the other party in default." *Webb,* 645 P.2d at 56. "However, an action for specific performance may also be maintained if the plaintiff presents an excuse for his failure to make such payment or tender and avers his ability, readiness and willingness to pay the contract amount." *Reed v. Alvey,* 610 P.2d 1374, 1379 (Utah 1980); *accord Tanner v. Baadsgaard,* 612 P.2d 345, 347 (Utah 1980); *Barker v. Francis,* 741 P.2d 548, 553 (Utah Ct.App. 1987).

Here, PDQ did not fully and completely tender the performance of its contractual obligations. However, the trial court concluded that PDQ "made all reasonable efforts to comply in good faith with its obligations under the contract," and that "[a]ny failure of [PDQ] to perform under the contract was directly related to or caused by [Huber's] bad faith and failure to perform." Further, there was testimony during the course of the trial that PDQ was still ready, willing, and able to buy the property. Accordingly, the trial court was correct in concluding that, although PDQ had not tendered its performance, an award of specific performance in PDQ's favor could be granted. *See Reed,* 610 P.2d at 1379 (holding although buyer failed to pay purchase price he could still bring action in specific performance because seller failed to complete construction and buyer averred in complaint that he was willing and able to buy property).

■ We conclude that the trial court correctly determined that Huber breached the covenant of good faith and fair dealing and that specific performance was a proper remedy despite PDQ's deficient tender. Accordingly, the trial court's judgment is affirmed.[10]

## C. Costs and Attorney Fees

■ PDQ has requested an award of costs and attorney fees on this appeal based on the real estate purchase contract provision, which provided: "In any action arising out of this Contract, the prevailing party shall be entitled to costs and reasonable attorney[ ] fees." PDQ has prevailed on this appeal and is therefore entitled to an award of costs and

9. Although not important to the analysis, we note that despite his assertions to the contrary, Huber never testified that the reason he delayed performing was because PDQ had not obtained financing. Huber testified only that he delayed because he had not received the $4,000 cleanup deposit. *See supra* note 4. As is apparent from the factual findings, the trial court did not believe the testimony.

10. Although Huber did not brief the issue, and thus we would normally decline to address it, *see supra* note 6, one of the issues for appeal was whether, if the contractual conditions were concurrent conditions, the trial court could order

Huber to remove the tanks before PDQ was required to pay the purchase price. We simply note that "[s]pecific performance is an equitable remedy, and accordingly, the trial court is granted wide discretion in applying and formulating it." *LHIW, Inc. v. DeLorean,* 753 P.2d 961, 963 (Utah 1988). Thus, because the trial court found that Huber acted in bad faith and failed to perform and that PDQ had done everything that it could do up to that time, the trial court did not abuse its discretion by ordering Huber to perform first despite the implied contractual condition of concurrent performance.

reasonable attorney fees.[11] *See R & R Energies v. Mother Earth Indus., Inc.,* 936 P.2d 1068, 1081 (Utah 1997) (awarding attorney fees on appeal to prevailing party pursuant to contractual provision). We remand to the trial court for a determination of the amount of costs and reasonable attorney fees and order that the amount be awarded to PDQ.

## II. PDQ's Appeal

We next address PDQ's appeal of the trial court's subsequent order terminating Huber's obligation to convey the property pursuant to the court's July 3, 1995 judgment. The primary issues raised by PDQ are (1) whether the trial court erred in concluding· that a conditional cashier's check was insufficient to constitute tender, and (2) whether the trial court abused its discretion in denying PDQ's motion for a new trial, amended judgment, and evidentiary hearing.

### A. Tender

▆▆ PDQ appeals the trial court's later order releasing Huber from his obligation to convey the property. It argues that the court erred as a matter of law in concluding that PDQ had failed to tender its performance to Huber before the eighty-four-day period expired. Again, we review the trial court's conclusions of law for correctness.

A mere offer to pay generally does not constitute a valid tender. In order to be valid, tender of payment on a contract must be (1) timely, (2) made to the person

entitled to payment, (3) unconditional, (4) an offer to pay the amount of money due, and (5) "coupled with an actual production of the money or its equivalent."

*Fitzgerald v. Corbett,* 793 P.2d 356, 359 (Utah 1990) (footnotes omitted) (quoting *Zion's Properties, Inc. v. Holt,* 538 P.2d 1319, 1322 (Utah 1975)); *see also Century 21 All W. Real Estate & Inv. Inc. v. Webb,* 645 P.2d 52, 56 (Utah 1982) ("To qualify under this rule, a tender, such as an offer to pay money, must be complete and unconditional."); *Timpanogos Highlands, Inc. v. Harper,* 544 P.2d 481, 485 (Utah 1975) ("To constitute a valid tender, there must be an actual and bona fide offer to pay the whole amount of money due.").

PDQ concedes that tender was due on November 30, 1995, but argues that it timely tendered its payment when checks totaling the sum of $125,000 were delivered to the title company by that date, and it provided a letter of tender to Huber on November 28, 1995, pursuant to Utah Code Ann. § 78–27–1 (1996).[12] It contends that, although the cashier's check from Guardian State Bank was conditional, the conditions were not placed on Huber and thus the tender was not conditional [13] and was proper. PDQ further states that PDQ complied with the check's condition within the order's time period to tender.

PDQ has only challenged the legal conclusions of the trial court and has not challenged its factual findings.[14] In its memo-

---

11. Huber never argued in its brief that attorney fees and costs should not be awarded.

12. Utah Code Ann. § 78–27–1 (1996) provides: "An offer in writing to pay a particular sum of money or to deliver a written instrument or specific personal property is, if not accepted, equivalent to the actual production and tender of the money, instrument or property."

13. The prohibition against conditional tender forbids the tendering party from adding new noncontractual conditions or requirements for receiving the tender. *See Kelley v. Leucadia Fin. Corp.,* 846 P.2d 1238, 1243 (Utah 1992); *Sieverts v. White,* 2 Utah 2d 351, 355, 273 P.2d 974, 976 (Utah 1954); 5A Arthur L. Corbin, *Corbin on Contracts* § 1235, at 530–32 (1964). PDQ maintains that because the check was conditioned on *its* compliance with the terms, and not Huber's compliance with the terms, the tender was not conditional.

14. PDQ challenges only the trial court's conclusion that PDQ failed to provide proper tender. However, it does seem to tangentially dispute the factual finding that PDQ did not provide evidence that PDQ Lube Center, Inc. was properly registered. Although PDQ does not contend that it provided the title company evidence that PDQ Lube Center, Inc. was properly registered, it argues that, because the trial court held in its earlier findings of fact and conclusions of law that PDQ Lube Center was reinstated in January of 1995, it met the requirement that it provide ·proof of the corporation's registration to the title company. We would not normally address this issue because PDQ has failed to marshal the evidence in favor of the trial court's finding. *See Interwest Constr. v. Palmer,* 923 P.2d 1350, 1358 (Utah 1996). Even if PDQ had marshaled the evidence, however, it does not follow that because in July 1995 the trial court concluded that PDQ Lube Center, Inc., had been reinstated in January 1995 the trial court should have found

randum decision, the trial court specifically found that the title company "had not received the documentation required to satisfy" the condition placed on the check.

■ "[A] tender by check is not good unless there are sufficient funds in the account against which it is drawn, and available for full payment of the check at any time *upon its presentation in due course*, and unless the check is then accepted by the obligee without objection." *Sieverts v. White*, 2 Utah 2d 351, 355, 273 P.2d 974, 976 (Utah 1954); *accord In re Estate of Kohlhepp v. Mason*, 25 Utah 2d 155, 158–59, 478 P.2d 339, 341–42 (Utah 1970). "Informing an obligee that you are ready and willing to perform the contract is insufficient." *Washington Nat'l Ins. Co. v. Sherwood Assocs.*, 795 P.2d 665, 670 (Utah Ct.App.1990).

■ The trial court's findings reveal that PDQ had failed to meet a condition of the Guardian State Bank cashier's check by the court-ordered deadline, and, consequently, the check was not payable upon demand to the title company on November 30, 1995. Although the facts in the above-cited cases relate to the insufficiency of funds in a checking account, the principle involved in this case is the same. There may have been sufficient funds to cover the Guardian State Bank check, but the funds were not available upon presentation to the bank because PDQ had not fulfilled the check's conditions. Hence, the title company was unable to pay Huber the full purchase price. The attempted tender therefore was not timely nor was it coupled with actual production of the money underlying the written tender offer.[15] Accordingly, the trial court was correct in concluding that PDQ's attempted tender did not constitute tender under the court's order.[16]

■ PDQ further argues, however, that Huber waived his objection to the conditional cashier's check because at the time of Huber's objection to the tender the cashier's check had not been delivered to the title company. *See* Utah Code Ann. § 78–27–3 (1996).[17] Even assuming that Huber's letter

in December 1995 that PDQ met its obligation of providing the title company with evidence that PDQ Lube Center, Inc. was properly registered with the state. Assuming that presenting the trial court's findings to the title company would have been sufficient evidence of proper registration, PDQ should have at least averred that it gave the title company a copy of the trial court's decision, which it never did. Instead, PDQ wishes this court to assume that Joel Rush, the Guardian State Bank representative, should have known that the trial court had so concluded as he was a witness in the previous proceeding, that Rush conveyed his knowledge to the title company, that the title company accepted that representation as sufficient to fulfill the condition, and that all this communication occurred before December 1, 1995. This we decline to do.

15. In *Krantz v. Holt*, 819 P.2d 352, 355 (Utah 1991), the Utah Supreme Court held that unless a party to an action actually presented a check to a bank and the check was dishonored the party could not claim "failure of consideration" or insufficiency of tender. This case of course is factually distinct. In *Krantz*, the defendant personally asked the bank on several occasions whether the plaintiff's bank account had sufficient funds to cover the plaintiff's check. *See id.* at 354. When told that there were not, she never tried to deposit or cash the check; she was not aware that a credit arrangement had been made whereby the bank would pay the check despite insufficient funds at that time. *See id.* at 354–55. In this case, the title company was given the check and with it the condition that PDQ had to fulfill before the bank would honor the check. The title company was the entity from which Huber was required by the contract and the dealings of the parties to obtain PDQ's payment. When Huber requested payment from the title company and it refused to pay, he had done all he could do to obtain payment. Additionally, the conditions given at the outset made it clear to the parties that the check would not be honored unless the conditions were fulfilled. The holding in *Krantz* is therefore inapposite to the facts of this case.

16. Although PDQ seems to argue that the trial court found that the tender was conditional, the memorandum decision concludes that PDQ failed to make proper tender because "[t]he funds were not available for distribution on November 30, 1995." Thus, the trial court did not base its conclusion on the fact that the tender was conditional, but rather on the fact that the tender was not timely and not coupled with actual ability to pay the amount due.

17. Utah Code Ann. § 78–27–3 (1996) provides:

The person to whom a tender is made must, at the time, specify any objection he may have to the money, instrument or property, or he is deemed to have waived it; and, if the objection is to the amount of money, the terms of the instrument or the amount or kind of property, he must specify the amounts, terms or kind

objecting to tender was insufficient as to the Guardian State Bank cashier's check, the case law is clear that a person need not object to the tender of a check if the check is not payable when presented. *See Mason,* 478 P.2d at 341; *Sieverts,* 273 P.2d at 976 (stating check tendered, despite absence of objection, only when "available for full payment ... at any time *upon its presentation in due course* "); *see also Harper,* 544 P.2d at 485–86 (stating that although no objection to tender was made, "also to be considered are these propositions: that the plaintiff had the burden of proving that it had a live and viable contract which included either that it had performed its obligations, or that it had made a valid tender to do so, neither of which the plaintiff had done here"). In this case, PDQ did not make a valid tender by November 30, 1995, because PDQ failed to fulfill a condition of the cashier's check, and the check was therefore not payable upon its presentation to the bank. Thus, because PDQ has failed to show that it made a valid tender, Huber need not have objected to the check's tender to prevail against PDQ. Consequently, the trial court was correct in ruling that PDQ failed to properly tender its payment even though Huber had not specifically objected to the check.

PDQ next argues that it is excused from tendering the amount in any event because Huber failed to deliver clear title to the property to it, and, thus, payment of the purchase price would " 'be an idle ceremony and of no avail.' " *Fitzgerald v. Corbett,* 793 P.2d 356, 359 (Utah 1990). We disagree. The trial court's order provides that "Huber is required to convey the property to [PDQ] if [PDQ] is able to tender the full purchase price within 84 days following the proof to [PDQ] of environmental clearance for the site." Accordingly, Huber was only required to convey the property to PDQ if he received the full purchase price within eighty-four

days. PDQ did not pay the full purchase price within eighty-four days. Consequently, Huber was not required to provide clear title. PDQ's suggestion that Huber was required to convey the property before PDQ's payment is contrary to the court's order. The trial court was correct in ordering termination of the contract.[18]

## B. Rule 59

Finally, PDQ argues that the trial court abused its discretion in denying its motion under Rule 59 of the Utah Rules of Civil Procedure for a new trial, amendment of judgment, and request for an evidentiary hearing. "In deciding whether to grant a new trial, a trial court has some discretion, and we reverse only for abuse of that discretion." *Crookston v. Fire Ins. Exch.,* 817 P.2d 789, 799 (Utah 1991). PDQ argues that newly discovered evidence regarding the delivery of PDQ Lube Center of Logan, L.L.C.'s articles of organization to the title company on November 30, 1995 required the trial court to grant a new trial, amended judgment, or new evidentiary hearing.

When bringing a motion under Rule 59 for a new trial, amendment of judgment, or evidentiary hearing based on discovery of new evidence:

> [T]he moving party must show that the evidence has three characteristics in order for a new trial to be granted. First, it must be material competent evidence which is in fact newly discovered. Second, it must be such that it could not, by due diligence, have been discovered and produced at trial. Finally, it must not be merely cumulative or incidental, but must be of sufficient substance that there is a reasonable likelihood that with it there would have been a different result.

*In re S.R.,* 735 P.2d 53, 57–58 (Utah 1987).

PDQ never contended or averred in its motion that it found new evidence of the

---

which he requires, or be precluded from objection afterwards.

**18.** On Huber's appeal we held that PDQ could bring an action for specific performance against Huber despite PDQ's failure to tender. Thus, upon a cursory reading, our holding as to the tender issue on PDQ's appeal may appear to be inconsistent with our holding in Huber's appeal. We simply note that the facts in PDQ's appeal are distinct. In Huber's appeal, the trial court held that PDQ's failure to perform was a result of Huber's bad faith conduct and further that PDQ had performed as much as it could perform. Thus, PDQ was excused from tendering its performance of the contract. In contrast, PDQ had no excuse for its failure to tender its performance of the court order.

delivery of *PDQ Lube Center, Inc.'s* proper registration to the title company before November 30, 1995. *See supra* note 14. Thus, the fact that it discovered that PDQ had delivered evidence of PDQ Lube Center of Logan, L.L.C.'s proper registration to the title company on November 30, 1995, would not have produced a different result. PDQ needed to allege that it had discovered that it had delivered evidence of proper registration of both entities. Because PDQ did not aver such a discovery, it was not an abuse of discretion for the trial court to refuse to grant a new trial or evidentiary hearing.[19]

## CONCLUSION

On Huber's appeal we hold that, because Huber had a duty to pursue the common purpose of the contract, the trial court was correct in concluding that Huber breached the covenant of good faith and fair dealing when he refused to remove underground storage tanks during the executory period of the contract. The trial court was also correct when it concluded that PDQ was not required to tender its performance before bringing suit for specific performance because it found that Huber's breach was the sole reason for PDQ's failure to perform.

Because PDQ has prevailed on the Huber appeal, we grant its motion for costs and reasonable attorney fees. Further, on PDQ's appeal, we hold that the trial court correctly terminated Huber's obligation to perform the contract when it concluded that PDQ failed to tender payment within eighty-four days of Huber providing evidence of environmental clearance. It was also not an abuse of discretion for the trial court to refuse to grant PDQ's motion for a new trial, amended judgment, and evidentiary hearing. Accordingly, the trial court's judgment and order are affirmed. Additionally, we remand to the trial court to determine the amount of costs and reasonable attorney fees incurred in PDQ's defense of Huber's appeal and order that the amount determined by the trial court be awarded to PDQ.

DAVIS, P.J., and WILKINS, Associate P.J., concur.

---

19. PDQ also asserts that the trial court could not have understood the complex factual sequence without a new evidentiary hearing. However, given the facts that the allegedly complex factual situation hinged only on a determination of whether PDQ had presented the title company with evidence of PDQ Lube Center, Inc.'s proper registration, and PDQ never alleged any such evidence in its motion or memorandum supporting the motion, an evidentiary hearing would have had no consequence.